UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JAMES T. SCATUORCHIO RACING STABLE, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 11-374-DCR |
| V. | ) ) | |
| WALMAC STUD MANAGEMENT, LLC, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendants Walmac Stud Management, LLC ("Walmac Stud"), Walmac Farm, LLC ("Walmac Farm"), Lincoln-Walmac Associated Farm Pty Ltd. ("Lincoln-Walmac"), John T.L. Jones III ("Jones"), and Saybrook Advertising, LLC's ("Saybrook") Motion to Dismiss Counts Five, Six, Seven, Eight, Nine, Eleven, Twelve, and Fourteen of the Second Amended Complaint for Failure to State a Claim. [Record No. 105] Plaintiffs James T. Scatuorchio, LLC ("Scatuorchio, LLC"), James T. Scatuorchio, Kevin Scatuorchio, Courtney Sullivan, and Bryan Sullivan have also filed a Motion to Strike Attachment to Defendants' Reply in Support of their Motion to Dismiss. [Record No. 112] For the following reasons, the defendants' motion to dismiss will be granted in part and denied in part. The plaintiffs' motion to strike will be denied.

-1-

# I.

This matter arises from the ownership and management of the thoroughbred stallion Ready's Image which is currently co-owned by the plaintiffs and a number of the defendants. The plaintiffs' Complaint is predicated upon the alleged "dishonest and fraudulent" manner in which the defendants managed the stud career of Ready's Image and the breach of a number of relevant contracts between the parties.

## A.    Factual Background

Plaintiff James T. Scatuorchio has been involved in the development and racing of thoroughbred horses for over ten years.  In 2008, he formed Scatuorchio, LLC as a Florida Limited Liability Company, of which he serves as the sole member.  [Record No. 72 ¶¶ 17, 18] Scatuorchio, LLC, along with James T. Scatuorchio's children, Kevin Scatuorchio and Courtney Sullivan, each own interests in Ready's Image.  [*Id.* ¶ 19] Walmac Farm is located in Lexington, Kentucky.  It boards, breeds, sells, establishes the stud lines of, and markets the breeding potential of stallions.  [*Id.* ¶ 24]  Saybrook is an entity associated with Walmac Farm which markets its thoroughbreds for breeding.  [*Id.* ¶ 25]

In 2008, the Walmacs[1] approached James T. Scatuorchio about buying an ownership interest in Ready's Image and managing the horse's career as a stud.  [*Id.* ¶ 20]  During these discussions, the Walmacs made a number of representations concerning the defendants' ability to manage Ready's Image's stud career.  Among these representations was that: (i) they could "do everything that was necessary to maximize the likelihood of Ready's Image's success; (ii)

---

[1]     The Complaint defines "the Walmacs" to include Walmac Stud, Walmac Farm, and Jones.

Jones owned Walmac Farm and was a "stallion manager," a breeding industry professional responsible for breeding and handling stallions; (iii) the Walmacs "had an excellent reputation[] in Kentucky thoroughbred breeding community; and (iv) they had the ability and means to successfully market Ready's Image in both the United States ("Northern Hemisphere") and Australia ("Southern Hemisphere"). [*Id.* ¶¶ 21, 27] Additionally, the Walmacs represented that they could expose Ready's Image to a "book of more than 100 mares" in the horse's first breeding season. [*Id.* ¶ 28] The plaintiffs estimate that this could have generated roughly $1.5 million in stud fees. [*Id.*]

The plaintiffs allege that these representations "resonated with [them] because their overriding goal was (and is) to successfully breed Ready's Image to a sufficient quality and quantity of mares to satisfactorily ensure that his blood line would continue for generations," as this is "essential to Ready's Image establishing himself as a successful stallion." [Record No. 109, p. 5; Record No. 72, ¶ 28] Based on the representations made by the Walmacs, in October 2008, Scatuorchio, LLC, Kevin Scatuorchio, and Courtney Sullivan sold a two-thirds undivided interest in Ready's Image to Walmac Stud for $2.4 million. [Record No. 72 ¶¶ 32, 47] This initial transfer of ownership interests was memorialized in the "Sale Agreement" and "Co-Ownership Agreement" ("COA"). [*Id.* ¶¶ 32-35] As part of the agreements effectuating the sale and co-ownership arrangements, Walmac Stud was named as the "Stallion Manager," and would be responsible for the day-to-day management of Ready's Image and "procuring business for the syndicate in the form of mare owners paying to breed their mares to Ready's Image." [Record No. 109, p. 5; Record No. 72 ¶ 39]

-3-

## 1.      Southern Hemisphere Agreements

On April 23, 2009, the parties entered into three additional agreements vesting other entities with ownership rights and responsibilities concerning the management of Ready's Image in the Southern Hemisphere.  [Record No. 72 ¶ 51]   These agreements consisted of: (i) the Southern Hemisphere Sale Agreement; (ii) the Southern Hemisphere Co-Ownership Agreement ("SHCOA"); and (iii) Southern Hemisphere Lease Agreement ("SHLA"), (collectively, the "Southern Hemisphere Agreements").  [*See id.* ¶¶ 51-67]

The Southern Hemisphere Agreements conferred an ownership interest in Ready's Image to Defendant Lincoln-Walmac, and the SHCOA designated Walmac Stud as the stallion manager for all Southern Hemisphere operations.  [*Id.* ¶¶ 41, 52, 60]  The underlying purpose of the SHCOA was to govern the rights and obligations of the parties having an ownership interest in Ready's Image in the Southern Hemisphere during the stallion's time in Australia, where it spends several months of the year breeding.  [*Id.* ¶ 58]

Under the SHLA, Lincoln-Walmac was also designated as a lessee of the "use, purpose and attributes" for the purpose of Ready's Image's breeding in the Southern Hemisphere for the 2009-2012 Southern Hemisphere breeding seasons.  [Record No. 72-1, p. 67]  In accordance with the SHLA, Lincoln-Walmac also assumed the responsibility for the care, upkeep, and marketing of Ready's Image in the Southern Hemisphere, and thus became "in essence . . . the Stallion Manager of Ready's Image in the Southern Hemisphere for the duration of the lease." [*Id.* ¶¶ 65, 66; Record No. 109, p. 6]  Lincoln-Walmac was responsible for remitting to the co-

owners[2] any revenue generated by Ready's Image in the Southern Hemisphere in the form of "Stallion Rent."[3] [Record No. 72 ¶ 65]

### 2. Mare Agreement

As dictated by the original Sale Agreement, Walmac Stud was responsible for the marketing and procuring mares to breed with Ready's Image. [*Id. ¶* 68]  However, by early 2010 James Scaturochio, Kevin Scatuorchio, and Bryan Sullivan (collectively, the "Mare plaintiffs") became concerned that not enough was being done to promote Ready's Image to potential mare-owners. [*Id. ¶* 69]  Due to these concerns, the Mare plaintiffs entered into the "Mare Agreement" with Walmac Farm on January 20, 2010.[4]  [*Id. ¶¶* 68-70]  Pursuant to the Mare Agreement, the Mare plaintiffs would receive the proceeds of any contracts associated with

---

2   Schedule I of the SHLA identifies the ownership interests of Ready's Image's Southern Hemisphere co-owners as follows: (1) Lincoln-Walmac — 25%; (2) Scatuorchio, LLC — 25%; (3) Kevin J. Scatuorchio — 16%; (4) Courtney Sullivan — 16%; (5) Hengst Funding, LLC, d/b/a/ Gaines Gentry Stallion Holdings, a Kentucky Limited Liability Company — 10%; (6) Kerry T. Cauthen — 3%; and (7) Four Star Sales, LLC — 5%.  [Record No. 72-1, p. 78]

3   Specifically, the SHLA provides that:

> [F]or each Lease Year of the Lease Term, an amount equivalent to all collected and nonrefundable/non-repayable revenues (net of G.S.T.) as a result of the sales of nominations to Ready's Image for each Lease Yar, less an amount equal to the greater of (i) Sixty-Five Thousand Dollars U.S. ($65,000.00 U.S.D.), or (ii) ten times the advertised stud fee (net of G.S.T.), for one southern hemisphere nomination to Ready's Image during such Lease Year, payable promptly in arrears within ninety (90) days following the date of collection of such nonrefundable/non-repayable revenues.  Provided however Lessee may set off from Stallion Rent, any expenses of Ready's Image, which Lessee has paid/advanced and which are the responsibility of Lessors hereunder.

[Record No. 72-1, p. 68]

4   The plaintiffs allege that procuring mares for Ready's Image to breed with was the responsibility of Walmac Stud, as Stallion Manager.  However, Jones executed the Mare Agreement on behalf of Walmac Farm, instead of Walmac Stud, and the plaintiffs contend that Walmac Farm had no ownership interest in, or duty to manage Ready's Image prior to this agreement.  [Record No. 72 ¶ 71]

mares delivered by any of the Mare plaintiffs to Walmac Farm for breeding with Ready's Image, up to a limit of twenty mares during the 2010 season. [*Id.* ¶ 72]  In accordance with the Mare Agreement, the Mare plaintiffs delivered at least ten mares to the Walmacs for breeding to Ready's Image. [*Id.* ¶ 83]

The plaintiffs allege that the defendants have failed to meet their obligations as set forth in these contracts.  The plaintiffs have not received from "any defendant any distribution of revenues generated by Ready's Image," and have not received any funds from Walmac Farm or Walmac Stud pursuant to the Mare Agreement. [*Id.* ¶¶ 73-77] Additionally, pursuant to an audit by the Curchin Group, LLC that was conducted at the behest of the plaintiffs, it was found that: "the billing records were demonstrably erroneous; moneys appropriately due to Ready's Image had been inexplicably diverted from Ready's Images' account; the Walmacs had overbilled [the plaintiffs] for various expenses; and there was simply not a complete accounting relative to Ready's Image from which [the plaintiffs] could either complete their tax returns or ascertain moneys due." [*Id.* ¶ 79]

**B.   Procedural History**

On March 30, 2011, the plaintiffs commenced this action in New Jersey state court.[5]  The defendants then removed the matter to the District Court of New Jersey.  [Record Nos. 1, 1-2]  Following removal, the defendants moved to dismiss the action in favor of mediation or arbitration.  In the alternative, they sought to transfer venue.  On November 21, 2011, this action

---

5       The plaintiffs filed their initial Verified Complaint in New Jersey Superior Court on April 1, 2011. However, on April 19, 2011, the plaintiffs filed a First Amended Verified Complaint in the Superior Court of New Jersey.  [Record Nos. 1-2, 1-11]

-6-

was transferred to this district.  [Record Nos. 19, 28]  Thereafter, the plaintiffs were granted leave to file a Second Amended Verified Complaint (the "Complaint"), and the defendants renewed their motion to dismiss in favor of arbitration or mediation.  [Record Nos. 71, 72, 75] The Complaint consists of fourteen counts arising from the ownership and management of Ready's Image.  Specifically, the plaintiffs allege that the defendants fraudulently induced the plaintiffs to transfer ownership interests in Ready's Image to the defendants and that after the ownership and management interests were transferred, the defendants breached the relevant agreements between the parties, resulting in breach of contract and fiduciary duties, fraud, waste, and conversion.

On September 13, 2012, the Court addressed the defendants' second renewed motion to dismiss in favor of arbitration or mediation, and directed that certain counts of the Complaint be submitted to arbitration.  [Record Nos. 86, 103] The Court's September 13, 2012 Memorandum Opinion and Order was later amended and clarified by subsequent Order on January 2, 2013. The Court held that the plaintiffs' claims in Counts One, Two, Four, Five, Seven, Nine through Thirteen, and part of Counts Eight and Fourteen, as they pertain to the parties Scatuorchio, LLC, Walmac Stud, John T.L. Jones III, James Scatuorchio, Kevin Scatuorchio, and Courtney Sullivan, should be submitted to arbitration.  [Record No. 103, p. 17]

On January 9, 2013, this matter was reassigned to the undersigned following the retirement of United States District Judge Jennifer B. Coffman.  [Record No. 109]  The defendants now move to dismiss Counts Five, Six, Seven, Eight, Nine, Eleven, Twelve, and

Fourteen of the Complaint for failure to state a claim.  [Record No. 105]  Specifically, the defendants seek the following relief:

(1)     Lincoln-Walmac moves to dismiss Count Five — Breach of Duty of Good Faith and Fair Dealing Owed Pursuant to the Southern Hemisphere Agreements;

(2)     Walmac Stud and Walmac Farm move to dismiss Count Six — Breach of Duty of Good Faith and Fair Dealing Owed Pursuant to the Mare Agreement;

(3)     Lincoln-Walmac moves to dismiss Count Seven — Breach of Fiduciary Duties;

(4)     Walmac Farm moves to dismiss Count Eight — Fraudulent Inducement — in its entirety;

(5)     Walmac Farm, Walmac Stud, and Jones move to dismiss Count Eight — Fraudulent Inducement — as it relates to the Mare Agreement;

(6)     Walmac Farm, Saybrook, and Lincoln-Walmac move to dismiss Count Nine — Accounting;

(7)     Walmac Farm and Lincoln-Walmac move to dismiss Count Eleven — Conversion;

(8)     Walmac Farm moves to dismiss Count Twelve — Violation of the New Jersey Consumer Fraud Act;

(9)     Walmac Stud and Lincoln-Walmac move to dismiss, in part, Count Fourteen — Rescission or Reformation — which deals with reformation of the arbitration clause; and

(10)     Lincoln-Walmac moves to dismiss, in part, Count Fourteen — Rescission or Reformation —  pertaining to the issue of rescission, as a whole.

-8-

The defendants' primary argument is that the plaintiffs assert claims which are not recognized under Kentucky law.  [Record No. 105]  Plaintiffs Scatuorchio, LLC, James T. Scatuorchio, Kevin Scatuorchio, Courtney Sullivan, and Bryan Sullivan have responded, arguing that the defendants' motion to dismiss is without merit.  They contend that the Complaint "more than adequately state[s] numerous causes of action."  [Record No. 109, p. 2]

## II.

The applicable standard of review and analysis for a motion for judgment on the pleadings under Rule 12(c) is the same for motions brought under Rule 12(b)(6).  *See Equal Emp't Opportunity Comm'n v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001).  Thus, the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Although the complaint need not contain "detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks and alteration omitted).

In considering a 12(b)(6) motion, the Court is required to "accept all of plaintiff's factual allegations as true and determine whether any set of facts consistent with the allegations would

entitle the plaintiff to relief." *G.M. Eng'rs & Assoc., Inc. v. West Bloomfield Twp.*, 922 F.2d 328, 330 (6th Cir. 1990) (citation omitted). However, the Court need not accept as true legal conclusions cast in the form of factual allegations if those conclusions cannot be plausibly drawn from the facts, as alleged. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting that in reviewing a motion to dismiss, the district court "must take all the factual allegations in the complaint as true," but that the court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Thus, Rule 12(b)(6) essentially "allows the Court to dismiss, on the basis of a dispositive issue of law, meritless cases which would otherwise waste judicial resources and result in unnecessary discovery." *Glassman, Edwards, Wade & Wyatt, P.C. v. Wolf Haldenstein Adler Freeman & Herz, LLP*, 601 F. Supp. 2d 991, 997 (W.D. Tenn. 2009).

## III.

As discussed above, this action arises out of a series of interdependent contractual and commercial agreements concerning the ownership and management of the stud career of the stallion Ready's Image, and the defendants' alleged failure to satisfy their duties under these agreements. The moving defendants argue that the plaintiffs have failed to plead causes of action under which relief may be sought.

The plaintiffs, however, assert that the defendants breached their contractual obligations concerning the management of Ready's Image in the Southern Hemisphere and their duty to remit payment to the plaintiffs for their efforts in securing mares to breed with Ready's Image

-10-

in the Northern Hemisphere.  The plaintiffs argue that the defendants, due to their status as co-owners and managers of Ready's Image, not only created a contractual relationship, but also a fiduciary relationship which the defendants breached.  Additionally, the plaintiffs contend that the Complaint "sets out in precise detail": (i) the circumstances surrounding the alleged fraud which induced the plaintiffs to enter the Mare agreement, (ii) the reasons why the plaintiffs have legal title to the money controlled and unlawfully converted by the defendants, (iii) how the plaintiffs, New Jersey residents, were defrauded in New Jersey in violation of the New Jersey Consumer Protection Act, and (iv) how the plaintiffs are entitled to an accounting, to the extent that their injury can be ascertained, because of the contractual and fiduciary relationships between the parties.  [Record No. 109, p. 3]

## A.    Counts Five and Six — Breach of Duty of Good Faith and Fair Dealing

In Count Five the plaintiffs allege that Walmac Stud and Lincoln-Walmac breached their duties of good faith and fair dealing pursuant to the Southern Hemisphere Agreements.  In Count Six, they assert that Walmac Stud and Walmac Farm breached their duties of good faith and fair dealing arising under the Mare Agreement.  [Record No. 72 ¶¶ 105-114]  The defendants argue that Kentucky law does not recognize independent tort claims for breach of the duty of good faith and fair dealing and, to the extent Counts Five and Six allege contractual causes of action for breach of these implied duties, these claims are already contained in Counts Two and Three, which generally allege causes of action for breach of contract.  As a result, the defendants argue that Counts Five and Six should be dismissed. [Record No. 105, pp. 5-8; Record No. 110, pp. 2-3]

-11-

Bad faith is generally described as "an intentional tort which results from a breach of the implied contractual duty of good faith and fair dealing." 86 C.J.S. Torts § 5 at 630 (1997). The "tort itself arises from a violation of a duty to act in good faith that is imposed by the common law, not by the terms of the contract." *Ennes v. H&R Block E. Tax Serv., Inc.,* No. 3:01-CV-447-H, 2002 U.S. Dist. LEXIS 419, at *7 (W.D. Ky. Jan. 14, 2002). However, it is well-settled that independent tort claims for breaches of duty of good faith and fair dealing are only permitted where a "special relationship exists between the parties." *Id.* Kentucky courts have only recognized the existence of such a relationship in the context of insurance contracts. *See id.* at *8-9; *see also Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.,* 864 F. Supp. 2d 629, 634; *Francis v. Nami Res. Co., LLC,* No. 04-510, 2008 U.S. Dist. LEXIS 25195, at *35-37 (E.D. Ky. Mar. 28, 2008). Therefore, because this matter does not arise out of an alleged breach of an insurance contract or an insurer – insuree relationship, any tort claim for breach of the covenants of good faith and fair dealing does not have a legal basis under Kentucky law.

Implicit in every contract in Kentucky is the covenant of good faith and fair dealing. *LJM Corp. v. Maysville Hotel Grp., LLC,* No. 2004-CA-120-MR, 2005 Ky. App. Unpub. LEXIS 341, at *5 (Ky. Ct. App. Apr. 8, 2005); *see also Rainer v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). This covenant has been interpreted to "mean that contracts impose on the parties thereto a duty to do everything necessary to carry [the contract] out." *LJM Corp.*, 2005 Ky. App. Unpub. LEXIS 341, at *5. Instructive of the interpretation of the covenant of good

faith and fair dealing is the commentary to KRS § 355.1-304,[6] which imposes an obligation of good faith in the performance to contracts within the Uniform Commercial Code.  It states:

> [t]his section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.  This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

KRS § 355.1-304; *see also Advancmed, LLC v. Pitney Bowers Credit Corp.*, No. 05-464-JBC, 2006 WL 1007467, at *3 (E.D. Ky. Apr. 17, 2006) (analyzing the commentary to U.C.C. § 1-304, which is identical to the commentary to KRS § 355.1-304, and noting that "[c]ourts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term") (citations and quotation marks omitted)).

Thus, a party's breach of the covenant of good faith and fair dealing can potentially be the basis for a viable breach of contract claim.  *See Francis,* 2008 U.S. Dist LEXIS 25195, at *35; *see also  Buridi v. Branch Banking & Trust Co.,* No. 3:12-CV-486-S, 2013 U.S. Dist. LEXIS 40967, at *18 (W.D. Ky. Mar. 25, 2013) ("A claim for breach of a covenant of good faith and fair dealing may be brought in contract or in tort."); *Rainer*, 812 S.W.2d at 156; *United*

---

6       Section 355.1-304 of the Kentucky Revised Statutes states that: "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."  KRS § 355.1-304.  While the U.C.C. is not controlling here, its commentary is instructive.

*Propane Gas, Inc. v. Fed. Mut. Ins.,* Nos. 2005-CA-001101-MR, 2005-CA-001111-MR, 2007 Ky. App. Unpub. LEXIS 503, at *9-10 (Ky. Ct. App. Mar. 16, 2007) (analyzing the covenant of good faith and fair dealing where the plaintiff alleged a breach of contract claim but did not identify the explicit contractual provision that was allegedly breached).  However, the "implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights."  *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005).

Although the plaintiffs do not specifically allege whether Counts Five and Six are tort claims for bad faith, the response to the defendants' motion to dismiss clarifies that these alleged causes of action do not sound in tort.  [Record N o. 109, pp. 10-12]  Instead, the plaintiffs now assert that Counts Five and Six are independently-alleged causes of action for breach of contract premised on a theory of breach of the covenant of good faith and fair dealing.  [*Id.*]  The plaintiffs contend that they should be allowed to allege more than one breach of the same contract and that Counts Five and Six are "independent of the express breaches alleged elsewhere in the Complaint."  [*Id.*, p. 11]  The defendants seem to argue that, because Counts Two and Three do not allege specific breaches of the agreements, these separate claims for the breach of the covenant of good faith and fair dealing should be dismissed and, to the extent these claims do exist, they are implicitly contained in general claims for breach of contract in Counts Two and Three.  [Record No. 110, pp. 2-3]

The defendants' arguments on this point are not persuasive.  Again, Kentucky law recognizes that a breach of the implied covenant of good faith and fair dealing can potentially serve as valid *basis* for a breach of contract claim.  *See Rainer*, 812 S.W.2d at 154; *see also*

-14-

*Francis*, 2008 U.S. Dist. LEXIS 25195, at *35. The plaintiffs have sufficiently pleaded the existence of the Mare Agreement and Southern Hemisphere Agreements governing the management of Ready's Image. These contracts have implied covenants of good faith and fair dealing. The plaintiffs' have also sufficiently pleaded breach of contract claims of these agreements and, as in *Advancmed, LLC*, because the plaintiffs' breach of contract claims have not been dismissed, "there remains an underlying contractual provision to which the breach of the duty of good faith and fair dealing claim may be applied." 2006 WL 1007467, at *4. The fact that the plaintiffs have alleged general breach of contract claims for the Southern Hemisphere Agreements and Mare Agreement in Counts Two and Three does not preclude the plaintiffs from alleging separate claims arising from the alleged breach of the covenant of good faith and fair dealing. Thus, because the plaintiffs have clarified that the allegations as set out in Counts Five and Six are separate breach of contract claims, and because these breach of contract claims have not been disposed of, Counts Five and Six will not be dismissed.

### B.    Count Seven — Breach of Fiduciary Duties

In Count Seven, the plaintiffs allege that Lincoln-Walmac breached certain fiduciary duties to Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, and Courtney Sullivan.[7] [Record No. 72 ¶¶ 115-119] They contend that these fiduciary duties are derived not only from Lincoln-Walmac's status as a co-owner of Ready's Image, but also as the "de facto Stallion Manager of Ready's Image in the Southern Hemisphere." [Record No. 109, p. 12] Lincoln-Walmac

---

7    Count Seven was previously ordered to be arbitrated as it pertains to Defendants Walmac Stud and John T. L. Jones III pursuant to the Court's January 2, 2013 Memorandum Opinion and Order. [Record No. 103, p. 17]

allegedly breached these obligations by failing to "adequately perform their duties as co-owners of Ready's Image and [by] fail[ing] to make distributions to the Plaintiffs." [Record No. 109, p. 12; Record No. 72, ¶¶ 115-119]

Under Kentucky law, there is no set formula for determining the existence of a fiduciary relationship. *See Gresh v. Waste Servs. of Am.*, 311 F. App'x 766, 770 (6th Cir. 2009). As a general rule, however, such a relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Caudill v. Salyersville Nat'l Bank*, No. 2008-CA-017-MR, 2010 Ky. App. LEXIS 1, at *9 (Ky. Ct. App. Jan. 8, 2010) (quotation marks and citation omitted); *see also Gresh*, 311 F. App'x at 770-71. A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing. *See In re Salle*, 286 F.3d 878, 891 (6th Cir. 2002) (interpreting Kentucky law); *see also Gresh*, 311 F. App'x at 771 (noting that "ordinary business relationships" conducted at arm's length do not rise to the level of a fiduciary relationship); *Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n*, 242 S.W.3d 359, 365 (Ky. Ct. App. 2007) ("An ordinary business relationship or an agreement reached through arm's length transactions cannot be turned into a fiduciary one absent factors of mutual knowledge of confidentiality or the undue exercise of power or influence." (quotation marks and citation omitted)). Additionally, while "fiduciary relationships can be informal, [] they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other." *In re Salle*, 286 F.3d at 893; *see also Abney v. Amgen, Inc.*, 443 F.3d 540, 550 (holding

-16-

that no fiduciary duty existed between the plaintiff and defendant because there was no evidence that the parties agreed that defendant would be acting *primarily* for the benefit of the plaintiffs) (emphasis added)).

Kentucky courts have found fiduciary relationships to exist in a number of contexts, although this determination is fact-specific to the relationship in question. *See Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 423 (Ky. Ct. App. 1978) (holding that because "the circumstances which may create a fiduciary relationship are so varied [] it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case"); *see also Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). The Sixth Circuit, however, has indicated that,

> [t]o make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. Second, the party claiming a fiduciary relationship must show that reliance was not merely subjective. Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary.

*In re Salle*, 286 F.3d at 892 (internal citations omitted).

Lincoln-Walmac argues that the plaintiffs have alleged no basis under which the Court could find that its relationship with the plaintiffs reached the level of a fiduciary relationship. The defendants contend that "the Southern Hemisphere Agreements in this case impose absolutely no duty on Lincoln-Walmac as a co-owner, and any duties it has in other capacities (lessee being the only actual other capacity) are those set forth in the detailed, written documents." [Record No. 110, p. 5] Conversely, the plaintiffs assert that there are "two key facts

-17-

that, when accepted as true, weigh heavily in favor of finding [that a fiduciary] relationship [exists]: co-ownership and management." [Record No. 109, p. 13] Thus, the plaintiffs conclude that the relationship between the parties is more than a mere "business relationship" and that the circumstances evidence a "relationship of special trust" sufficient to find that a fiduciary relationship exists and that this relationship existed prior to Lincoln-Walmac's failure to perform its duties. [*Id.*, p. 14 (citing *Steelvest*, 807 S.W.2d at 485)]

As the defendants point out in their brief, the Sixth Circuit recently held that "Kentucky law treats owners of horse-ownership syndicates as tenants in common."[8] *KNC Investments, LLC v. Lane's End Stallions, Inc.*, No. 12-5185, 2012 U.S. App. LEXIS 23191, at *3 (6th Cir. Nov. 8, 2012) (citing *Weisbord v. Gainesway Mgmt. Corp.*, No. 2007-CA-280-MR, 2008 Ky. App. Unpub. LEXIS 177, at *1-2 (Ky. Ct. App. Mar. 28, 2008)). Further, "it is well settled that tenants in common and joint tenants stand in a confidential or fiduciary relation to each other with respect to their *common interest* in the property." *Foley v. Smith*, No. 2003-CA-621-MR, 2004 Ky. App. Unpub. LEXIS 250, at *3 (Ky. Ct. App. May 14, 2004) (emphasis added). "As a general rule the fiduciary duties of tenants in common are coextensive with the cotenancy." *Givens v. Givens*, 387 S.W.2d 851, 853 (Ky. Ct. App. 1965). However, "[t]he mere existence of a cotenancy does not *ipso facto* create a fiduciary relationship between the cotenants in all dealings among them." *Howell v. Bach*, 580 S.W.2d 711, 712 (Ky. Ct. App. Aug. 11, 1978).

---

8       The Southern Hemisphere COA provides that the "[Southern Hemisphere] Co-Owners hereby agree to own, hold and operate their rights and interests under the Ready's Image 1/3 Purchase Agreement as tenants in common." [Record No. 72-1, p. 54]

Lincoln-Walmac's status as the "de facto Stallion Manager," by itself, is insufficient to support a finding that a fiduciary relationship existed between the parties. *See, e.g., Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.,* 864 F. Supp. 2d 629, 639-40 (E.D. Ky. Mar. 30, 2012); *Welk v. Simpkins* 402 F. App'x 15, 20 (5th Cir. Nov. 8, 2010) (applying Texas law); *see also In re Salle*, 286 F.3d at 891. Additionally, plainly alleging co-ownership, by itself, is equally insufficient to support a finding of the existence of a fiduciary relationship. *See Howell,* 580 S.W.2d at 712. These two points are undisputed. However, the facts of this case present the question of whether a fiduciary relationship could plausibly arise out of the confluence of both co-ownership *and* management.

Pursuant to the Installment Sale Agreement and the Southern Hemisphere COA, the plaintiffs and Lincoln-Walmac are co-owners of Ready's Image. As a result, they are all entitled to proceeds generated from breedings with Ready's Image. Additionally, as set out in the SHLA, Lincoln-Walmac assumed the responsibility to secure mares to breed with Ready's Image and to make distributions of the revenue generated from those breedings in the form of "Stallion Rent" to the other syndicate owners. Specifically, the SHLA provides that Lincoln-Walmac, as the lessee, "shall pay Lessors promptly and in arrears, without credit, refund, offset, counterclaim, or deduction, as rent (the "Stallion Rent"), for the lease of the Southern Hemisphere breeding uses/purposess/attributes of Ready's Image." [Record No. 72-1, p. 68] Additionally, the provisions of the SHLA outlines, in detail, the responsibilities of Lincoln-Walmac while Ready's Image was in its joint or several care, custody and control. [*See id.* pp.

69-71.]   In short, Lincoln-Walmac agreed to secure business for the benefit of itself and other

syndicate co-owners and to account for the revenue generated by paying "Stallion Rent."

The defendants rely heavily on this Court's decision in *KNC Investments, LLC v. Lane's*

*End Stallions, Inc.*, No. 12-08-JBC, 2012 U.S. Dist. LEXIS 69850 (E.D. Ky. May 17, 2012), to

support their position.  However, the facts are distinguishable.  In that case, KNC, one of the co-

owners of an interest in the syndicated stallion, sued the syndicate stallion manager, Lanes End,

for breach of fiduciary duties concerning a number of issues over providing proper notice of the

sale and use of nomination rights[9] to the syndicated stallion.  *Id.* at *7.  The court held that

dismissal of the breach of fiduciary claims was proper because resolution of those claims relied

solely on the interpretation of the syndicate agreement and that Lanes End's obligations were

defined and limited under that agreement.  *Id.*  The court stated that, because the relationship was

governed by the syndicate agreement, the court

> cannot layer general agency obligations, such as the duty to work strictly in the
> best interest of the principal, onto the Syndicate Agreement, particularly in this
> arrangement, where Lane's End serves as agent to multiple principals, and where
> the Syndicate Agreement specifically provides that Lane's End must act against
> the interests of individual principals in certain situations.  Therefore, in
> interpreting the Syndicate Agreement and the duties it imposes upon Lane's End,
> the language of the Syndicate Agreement itself controls without reference to
> implied duties of general agency arrangements.

*Id.* at *8-9.

Although *KNC Investments, LLC*, only dealt with a dispute between a syndicate co-owner

and the syndicate stallion manager, here Lincoln-Walmac is not only the co-owner of Ready's

Image, but it has also accepted a number of the responsibilities of the stallion manager pursuant

---

9       A "nomination" is a right to breed a mare to a stallion.

to the SHLA.  The plaintiffs have sufficiently pled that their relationship with Lincoln-Walmac existed prior to the alleged breach of fiduciary duties.  Moreover, Lincoln-Walmac's status as a co-owner and as the "de facto stallion manager," pursuant to the SHLA, could support a finding that the plaintiffs' belief that Lincoln-Walmac was acting as a fiduciary was objective, and that it had a duty to act in the best interest of all the other co-owners, to the detriment of itself.  Given the limited factual record before the Court, dismissal of the plaintiffs' claim for breach of fiduciary duties against Lincoln-Walmac at this stage of the proceedings would be premature.

### C.      Count Eight — Fraudulent Inducement

In Count Eight, the plaintiffs assert a claim for fraudulent inducement concerning the Mare Agreement.[10]   [Record No. 72 ¶¶ 120-125]  The plaintiffs allege that "[i]n the Mare Agreement and discussions leading up to it, the Walmacs represented that they intended to give the Mare Plaintiffs the proceeds to which that agreement later entitled them, when they had no intention of doing so and made this representation to induce the Mare Plaintiffs to recruit mares for Ready's Image so that Walmac Farm and/or Walmac Stud could collect and keep the moneys generated therefrom."  [*Id.* ¶ 123]  The plaintiffs allege that the "Walmacs misrepresented and omitted material facts regarding, among other things, Jones' ownership of Walmac Farm, their abilities, reputations and wherewithal to effectively and successfully manage Ready's Image's

---

10      In accordance with the Court's January 2, 2013 Amended Memorandum Opinion and Order, the plaintiffs' claim of fraudulent inducement against the defendants concerning the Sale Agreement was decided adverse to the plaintiffs, and was ordered to be arbitrated.  [Record No. 103, pp. 9-10, 12;Record No. 109, p. 16 (With respect to the Sale Agreement, Plaintiffs agree with Defendants that the Court's prior order already decided that issue adverse to Plaintiffs.")]

breeding career;" that the Walmacs made these misrepresentations and omissions willfully; and that they knew or should have known that the plaintiffs would rely on these misrepresentations in entering into the Mare Agreement.  [*Id.* ¶¶ 121, 124]

Rule 9(b) of the Federal Rules of Civil Procedure requires that for all claims of fraud, the circumstances constituting the alleged fraud shall be pled with particularity.  *See* Fed. R. Civ. P. 9(b).  Under Kentucky law, a plaintiff pleading fraud must establish that the defendant: (1) made a material misrepresentation; (2) that was false; (3) that when he made it, it was known to be false, or made recklessly; (4) which was made with inducement to be acted upon; (5) which the plaintiff acted in reliance upon; and (6) which caused the plaintiff injury.  *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 640 (Ky. Ct. App. 2003); *see also United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  Put another way, to meet the particularity requirement of Rule 9(b), a complaint of fraud must allege the "time, place, and content of the misrepresentation on which [the plaintiff] relied, the fraudulent scheme, the intent of the defendants, and the resulting injury."  *Anderson v. Pine S. Capital*, 177 F. Supp. 2d 591, 596-97 (W.D. Ky. 2001) (citation omitted).  A plaintiff must establish each of these elements by clear and convincing evidence.  *See Bassett v. NCAA*, 428 F. Supp. 2d 675, 682 (E.D. Ky. 2006). Further, "representations as to future conduct will not support a fraud claim . . . [h]owever, a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract."  *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 800 (W.D. Ky. 2005) (citations omitted).

The defendants argue that Count Eight should be dismissed because the plaintiffs have not identified with requisite specificity which defendant made the alleged misrepresentations. Additionally, the defendants maintain that the Complaint fails to allege any injury, or to seek a remedy for the misrepresentation. [Record No. 110, 5-6] The plaintiffs respond that they have pled each element of fraud in accordance with Rule 9(b) and that this count, as it relates to the Mare Agreement, should not be dismissed. [Record No. 109, p. 17] The plaintiffs also assert that they are "entitled to further discovery on this claim so as to conclusively establish its allegations." [*Id.*]

The defendants' arguments on this issue have merit. Under Kentucky law, "when a complaint involves multiple defendants, each defendant's role must be particularized with respect to their alleged involvement in the fraud." *GMAC Mortg., LLC v. McKeever*, No. 08-459-JBC, 2010 U.S. Dist. LEXIS 91118, at *8-9 (E.D. Ky. Aug. 31, 2010) (citing *Coffey v. Foamex, L.P.,* 2 F.3d 157, 161-62 (6th Cir. 1993); *Anderson*, 177 F. Supp. 2d at 596-97)) (quotation marks omitted). The Complaint defines "the Walmacs" as including Walmac Stud, Walmac Farm, and Jones. [Record No. 72 ¶ 16] It does not, however, identify which defendant made which representation. [*See, e.g., Id. ¶* 121 ("the Walmacs misrepresented and omitted material facts . . . ."); ¶ 124 ("[t]he Walmacs made these misrepresentations")] Thus, the plaintiffs have failed to particularize each defendants' role in the alleged fraud.

Further, the plaintiffs' response to the defendants' motion to dismiss belies an assumption that all three defendants made the same alleged representations. While the introductory sentence of their response to the defendants' motion to dismiss Count Eight states that "Walmac Stud,

-23-

Walmac Farm, and Jones fraudulently induced the Plaintiffs . . .", in further arguing that they have sufficiently alleged the elements of fraud, the plaintiffs contend that "the Complaint alleges that *Walmac Farm and/or Walmac Stud* promised to give the Mare Plaintiffs revenue derived from their efforts in delivering mares for breeding . . . to which the Mare Plaintiffs were entitled . . . [and] that *Walmac Farm and/or Walmac Stud* 'had no intention of doing so' when the representation was made." [Record No. 109, p. 16 (quoting Record No. 72 ¶ 123) (emphasis added)]  The plaintiffs' arguments are devoid of any mention of Jones — one of the three defendants collectively defined as "the Walmacs"— as a party who made the alleged subject representations.  Additionally, the use of the conjunction "and/or" leaves little doubt that the Complaint does not meet the heightened requirement of identifying with particularity each party's involvement in the alleged fraud.  *See GMAC Mortg., LLC*, 2010 U.S. Dist. LEXIS 91118, at *8-9.  Simply put, the plaintiffs' vague reference to the identity of the defendants that made each of the specific representations is insufficient.[11]

The defendants' second argument that the plaintiffs have failed to allege any injury resulting from the claimed misrepresentations also has merit.  The sixth element of an actionable fraud claim requires that a plaintiff plead injury with particularity.  *See Rivermont Inn, Inc.*, 113 S.W.3d at 640.  And under *Twombly*, a plaintiff is obligated to provide more than mere labels and conclusions in his pleadings.  *See* 550 U.S. at 555 (internal quotation marks and alteration omitted).  As explained by the district court in *TWB Distrib., LLC v. BBL, Inc.*,

---

11    Walmac Stud is not a party to, nor referenced in, the Mare Agreement.  [*See* Record No. 72-1, pp. 80-81.]  The Mare Agreement was executed by James T. Scatuorchio, Brian Sullivan, Kevin Scatuorchio, as the "Original Owners," and by John T. L. Jones III, as the Managing Director of Walmac Farm, LLC and Stallion Manager for the Ready's Image Co-Owners.  [*Id.*]

-24-

> Plaintiffs cannot be heard to argue that they would not have entered into a contract had it not been for the defendants' fraud, but that they should recover damages under that contract as a remedy for the fraud. To warrant a damages award, they must allege some form of injury external to the breach of the very contracts they say were fraudulently induced. *See, e.g.*, *Rickert*, 996 S.W.2d at 469 (affirming an award of damages representing wages lost in foregoing an employment opportunity based on fraudulent promises by an employee of the defendant company). Stated another way, the subsequent alleged breaches, and not Brown's misrepresentations, were the legal causes of the injuries plaintiffs claim . . . .

No. 3:08-CV-509-S, 2009 U.S. Dist. LEXIS 117467, at *24-25 (W.D. Ky. Dec. 16, 2009) (citing *UPS v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999)).

The plaintiffs' allegations of injury from the defendants' fraudulent inducement consist of "procuring mares for breeding to Ready's Image and failing to receive the related income to which they were entitled." [Record No. 109, p. 17 (citing Record No. 72 ¶ 76 ("The Mare Plaintiffs never received from any of defendant any distribution of revenues generated by Ready's Image."))] This entitlement to income which the plaintiffs reference, however, is derived from the Mare Agreement and subsequent alleged breach of this contract by the defendants. [*See* Record No. 72-1, pp. 80-81] The plaintiffs have not identified any injury suffered separate from the alleged injury caused by the breach of the Mare Agreement. Without identifying some other injury external to the breach of the Mare Agreement, this claim cannot survive. *See TWB Distrib., LLC,* 2009 U.S. Dist. LEXIS 117467, at *24-25. Even under the most liberal readings of Rule 9(b), this conclusory allegation of injury contains no particularity. As a result, it will be dismissed.[12]

---

12      The defendants also contend that the rule of economic loss precludes the plaintiffs from recovering under a fraud theory because this claim arises out of a breach of contract allegation. [Record No. 110, p. 6] Specifically the defendants assert that "[u]nder Kentucky law, '[t]he economic loss doctrine precludes a

### D.      Count Nine — Accounting

In Count Nine, the plaintiffs seek an accounting from the defendants.  [Record No. 72 ¶¶ 126-131]  Subject to the Court's Amended Memorandum Opinion and Order, this claim against Walmac Stud and Jones has been ordered to arbitration.  [Record No. 103, p. 9]  Therefore, the claim for an accounting against Walmac Farm, Lincoln-Walmac, and Saybrook remains before the Court.  The Complaint states that Walmac Farm has failed to perform "accounting, billing, distribution, allocation, management an/or record-keeping services required of them" and that pursuant to "relevant contracts, each party is entitled to certain revenues . . . obligated to pay a share of properly incurred expenses for Ready's Image on an ongoing basis."  [Record No. 72 ¶¶ 127, 128]  Further, the plaintiffs allege that an "accounting is necessary to determine the amount and location of revenues generated, what expenses have been incurred, what those expenses were for, the reasonableness of those expenses and the proper allocation of those revenues and expenses to each party under each relevant agreement."  [Record No. 72 ¶ 130]  The defendants argue that this claim must be dismissed because the plaintiffs have not alleged any basis for a duty to account; an essential element of an accounting cause of action.  [Record No. 105-1, p. 15]

---

plaintiff from recovering under a fraud theory when that claim is intertwined with a breach of contract claim.'" [*Id.* (quoting *Westlake Vinyls v. Goodrich Corp.*, 518 F. Supp. 2d 955, 968 (W.D. Ky. 2007))].

While many courts have applied the economic loss rule to cases applying Kentucky law, the Supreme Court of Kentucky did not recognize this doctrine until 2011 in *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 733, 738 (Ky. 2011).  The court, however, limited its application to "claims arising from a defective product sold in a commercial transaction." *Id.* at 733.  The defendants have not put forth any arguments regarding the appropriateness of applying this rule to the facts of this case.  However, given the holding of *Giddings & Lewis*, it would seem improper.

An accounting is an equitable remedy and is defined as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Karem v. Bryant*, 370 S.W.3d 867, 871 (Ky. 2012) (citing 1 Am. Jur. 2d *Accounts and Accounting* § 52) (quotation marks omitted).   The Kentucky Court of Appeals recently opined that "[t]he underlying theory [of a claim for an accounting] is unjust enrichment - an accounting primarily prevents unjust enrichment by mandating the return of any benefit received as a result of a breach of fiduciary duty.  To maintain an accounting, the claimant must have a contractual or fiduciary relationship with the defendant against whom the accounting is directed and an interest in the monies or property subject to the accounting." *Gentry v. Cremeens*, No. 2008-CA-830-MR, 2009 Ky. App. Unpub. LEXIS 139, at *5 (Ky. Ct. App. May 29, 2009) (citation and quotations omitted); *see also Holley Performance Prods. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-53-TBR, 2009 U.S. Dist. LEXIS 102709, at *7 (W.D. Ky. Oct. 28, 2009) ("An accounting is a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation.  It is a statement in writing of debts and credits or of receipts and payments.") (quotation marks and citation omitted)).   Simply alleging a claim for an accounting is insufficient to withstand a motion to dismiss; rather, a plaintiff must furnish a sufficient legal basis for the request.

### 1.      Walmac Farm and Lincoln-Walmac

The parties do not dispute that to maintain a claim for an accounting, the claimant must have a contractual or fiduciary relationship with the defendant against whom the accounting is directed. The defendants, however, argue that no such relationship exists between Walmac Farm

-27-

and the plaintiffs, and Lincoln-Walmac and the plaintiffs.  [Record No. 105-1, pp. 15-16]  The plaintiffs contend that Walmac Farm is an entity bound by the Mare Agreement which requires it to make payments to the Mare Plaintiffs for delivering mares.  [Record No. 109, p. 18] Further, the plaintiffs assert that Lincoln-Walmac has a contractual and fiduciary relationship to manage Ready's Image in the Southern Hemisphere and to make distributions to the plaintiffs. [Record No. 109, p. 18]

While not alleged under the plaintiffs' claim for an accounting, the Complaint does assert that contractual relationships between the plaintiffs and Walmac Farm and Lincoln-Walmac exist.  [*See, e.g.,* Record No. 72 ¶¶ 68-72, 65]  Thus, the plaintiffs have sufficiently alleged the existence of the necessary contractual relationship and interest in assets to survive a motion to dismiss.  The defendants' motion to dismiss Count Nine against Lincoln-Walmac and Walmac Farm will be denied.

### 2.    Saybrook Advertising

As it pertains to Saybrook, Count Nine contains assertions that, "[b]y diverting moneys that should have been allocated to Plaintiffs to Saybrook and, upon information and belief, to other entities (sic) affiliated with Jones, Walmac Stud and/or Walmac Farm as well, Walmac Stud, Walmac Farm and Lincoln-Walmac have breached their duties to Plaintiffs, damaged them and made it impossible for them to accurately account for the moneys due them under the various agreements."  [Record No. 72 ¶ 129]  The Complaint identifies Saybrook as the arm of the Walmacs' business devoted to marketing the thoroughbreds."  [*Id.* 25]

-28-

The defendants argue that dismissal of this claim against Saybrook is appropriate because no fiduciary or contractual relationship exists between Saybrook and the plaintiffs, nor have the plaintiffs even alleged that such a relationship exists. [Record No. 110, p. 7] In their response, the plaintiffs attempt to avoid dismissal of their accounting claim against Saybrook by arguing that "due to [Saybrook's] status as a sister company of Walmac Farm and Walmac Stud, [it] must also account to Plaintiffs for its misuse of Plaintiffs' funds." [Record No. 109, p. 19] Further, the plaintiffs aver that Saybrook's "status as a sister company of Walmac Farm and Walmac Stud . . . supports the inference that Saybrook may also have engaged in business which rightfully should have been performed by Walmac Farm and Walmac Stud, both entities which owed contractual and/or fiduciary duties to Plaintiffs." [*Id.*]

The Court will decline to make such inference.[13]   Again, as a threshold issue, a contractual or fiduciary relationship must exist between a plaintiff and defendant for an accounting claim to proceed. *See Gentry*, 2009 Ky. App. Unpub. LEXIS 139, at *5. The plaintiffs concede that they have failed to allege that such a relationship exists between the parties. [Record No. 109, p. 19; *see generally* Record No. 72] Thus, this count will be dismissed against Saybrook for failure to plausibly allege that a contractual or fiduciary relationship[14] exists

---

[13]     The plaintiffs have offered no arguments or authorities regarding this issue beyond their assertion that Saybrook is the sister company of other defendants in this claim. The plaintiffs then contend that the Court should make the inference that — due to its status as a sister company of other defendants — Saybrook has the requisite relationship with the plaintiffs to satisfy the threshold issue of an accounting claim. However, the Court is unaware of any case in which a claim for an accounting against a sister company was found to be appropriate where there was no contractual or fiduciary relationship between the sister company and plaintiff. And more importantly, the plaintiffs have not alleged any facts to plausibly support such an argument.

[14]     The plaintiffs argue that "[t]o the extent the allegations in the Complaint are unclear as to the nature of this relationship, Plaintiffs seek leave to amend to allege additional facts to support such a finding and also

-29-

between the plaintiffs and Saybrook — a requisite element of an accounting claim. *See Gentry*, 2009 Ky. App. Unpub. LEXIS 139, at *5.

### E.      Count Eleven — Conversion

In Count Eleven, the plaintiffs allege that "the Walmacs and Lincoln-Walmac have willfully and/or negligently[15] deprived Sellers of, among other thing[s], their right to possess the books and records, and their rightful share of moneys and assets relating to and generated by Ready's Image," and that "[a]s a result of these acts, Plaintiffs have been damaged." [Record No. 72 ¶¶ 138, 139] While not entirely clear on its face, the plaintiffs attempt through this count to assert a claim for conversion.

Conversion is an intentional tort that involves the wrongful exercise of dominion and control over the property of another. *See St. Auto. Mutual Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. Ct. App. July 6, 1990); *see also Oliver v. Hilliard,* Nos. 2010-CA-1138-MR, 2010-CA-1236-MR, 2010-CA-1428-MR, 2010-CA-1479-MR, 2013 Ky. App. Unpub. LEXIS 201, at *19 ( "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.") (quoting Restatement (Second) of Torts, § 222A(1965))). Therefore, "the property converted must be property which the plaintiff has the

---

state that future discovery may well bear out that such a relationship existed." [Record No. 109, p. 19] This request will neither be granted nor does it save the plaintiffs' claim of an accounting against Saybrook. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) (noting that a plaintiff's request to amend the pleadings in lieu of a properly filed motion to amend is insufficient under Rule 15(a)).

15      To the extent the plaintiffs allege a cause of action for conversion arising from the "negligence" of the defendants, this claim fails as a matter of law. *See Ky. Ass'n of Cnty.'s All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 (Ky. 2005) ("Conversion is an intentional tort and there is no such thing as conversion by accident.") (citations and quotations omitted).

exclusive right to control." *Manhattan Assocs. v. Rider*, No. 3:02-CV-265-S, 2002 U.S. Dist. LEXIS 14178, at *5 (W.D. Ky. Aug. 1, 2002) (quotation marks and citation omitted).  Under Kentucky law, a claim of conversion consists of the following elements:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff[']s rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiffs possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiffs loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Cnty.'s All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005) (citation and quotations omitted); *see also Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55, 58 (Ky. Ct. App. June 10, 2005).  A plaintiff asserting a claim of conversion has the burden of establishing title to the converted property.  *See Gateway Auto Auction v. Gen. Motors Acceptance Corp.*, 398 S.W.2d 498, 500 (Ky. 1966).

### 1.     Conversion of the "Books and Records"

The plaintiffs concede that they have failed to plausibly state a claim for conversion of the "their right to possess the books and records." [Record No. 109, p. 19 n.9]  They have not alleged legal title to or right to possess the books or records, nor have they alleged that they made a demand for the property which was refused.  *See Ky. Ass'n of Cnty.'s All Lines Fund Trust*, 157 S.W.3d at 632 n. 12.  Therefore, Count Eleven will be dismissed.

## 2.    Conversion of "Rightful Share of Moneys and Assets"

While the Complaint does not state with particularity what "rightful share of moneys or assets"[16] the plaintiffs are referring to, their response to the defendants' motion to dismiss indicates that this Count alleges the conversion of money which the defendants "failed to distribute [to] them under [certain] contracts."   [Record No. 109, p. 20]   Specifically, the plaintiffs assert that Walmac Farm and Lincoln-Walmac collected and retained proceeds from certain breedings of which a portion of should have been remitted to the plaintiffs, pursuant to the Mare Agreement and Southern Hemisphere Agreements.  [*Id.*]  In short, the plaintiffs allege a claim of conversion for money which they contend is contractually owed to them.

"While a conversion action may be maintained for the recovery of money physically taken by Defendant from Plaintiff's possession, a conversion action will not lie to enforce a mere obligation to pay."  *Agnew Tuck Serv. v. Ranger Nationwide, Inc.*, No. 90-34 P(J), 1992 U.S. Dist. LEXIS 22723, at *13 (W.D. Ky. Apr. 20, 1992) (citing *Sherman v. Adams*, 302 Ky. 490, 194 S.W.2d 625 (1946); 89 C.J.S., *Trover and Conversion*, § 23 (1955)).  Additionally, a "conversion claim cannot be brought where 'the property right alleged to have been converted arises entirely from the [plaintiff's] contractual rights.'"  *Beacon Enter. Solutions Grp. v. MDT Labor, LLC*, No. 3:12-CV-759-H, 2013 U.S. Dist. LEXIS 10573, at *13 (W.D. Ky. Jan. 22, 2013) (quoting *Davis v. Siemens Med. Solutions USA, Inc.,* 399 F.Supp. 2d 785, 801 (W.D. Ky. Nov. 8, 2005); *see also Pioneer Res. Corp. v. Nami Res. Co., LLC,* No. 6:04-465-DCR, 2006 U.S. Dist. LEXIS 43192, at *35-36 (E.D. Ky. June 26, 2006) ("A conversion claim and a breach

---

16    The subject property which was allegedly converted is money and not any other type of asset. [Record No. 109, pp. 19-22]

-32-

of contract claim are not always incompatible.  However, a conversion claim will not exist if the property right alleged to have been converted arises entirely from the contractual rights to compensation."); *Atmos Energy Corp. v. Honeycutt*, Nos. 2011-CA-601-MR, 201-CA-783-MR, 2013 Ky. App. Unpub. LEXIS 77, at *36 (Ky. Ct. App. Jan. 25, 2013).

Here, the plaintiffs allege that they "had the right to possess the funds once Defendants failed to distribute them under the contracts" and that the "funds in question . . . are those associated with the revenue streams referenced in applicable contracts." [Record No. 109, p. 20] According to the plaintiffs, this conversion claim clearly relates only to monies allegedly owed to them pursuant to contracts with the defendants.  Therefore, since the plaintiffs' sole property right[17] to the money allegedly converted and their alleged right to possess the subject money arises entirely from their contractual right to compensation, this count will be dismissed.[18]  *See Davis*, 399 F. Supp. 2d at 801.

---

17      The plaintiffs assert that the "Mare plaintiffs acquired legal title to the proceeds Walmac Farm collected on horses delivered by the Mare Plaintiffs under a constructive trust." [Record No. 109, p. 20] The plaintiffs then allege that "Walmac Farm cannot . . . retain proceeds generated by the Mare Plaintiffs as it had a duty to pay those proceeds to the Mare Plaintiffs under the Mare Agreement.  The same is true with Lincoln-Walmac and its retention of money due under the Southern Hemisphere Agreements." [*Id.*] Nowhere in the Complaint or in any of its exhibits is it alleged that a constructive trust exists between the parties.  [*See* Record No. 72]  In fact, a constructive trust is a remedy in equity.  *See In re Omegas Group, Inc.,* 16 F.3d 1443, 1449 (6th Cir. 1994) (noting that a "constructive trust is merely a means by which the court can say that the defendant must relinquish to the plaintiff property that represents an unjust enrichment"); *see also Francis*, 2008 U.S. Dist. LEXIS 25195, at *48 (noting that a claim of a constructive trust is a remedy for unjust enrichment and denying the plaintiffs' constructive trust claim because his unjust enrichment claim had been dismissed).  The plaintiffs, however, have not alleged a cause of action for unjust enrichment.

18      The plaintiffs concede that the Complaint does not explicitly allege that the plaintiffs made a demand for the "rightful share of money" that was allegedly owed to them, in satisfaction of the fifth element of a claim for conversion.  [Record No. 109, p. 20]  Instead, they urge the Court to glean from "a fair reading of the Complaint" that such a demand is implied.  [*Id.*]  The Court will decline to do so.  Therefore, Count Eleven is also dismissed on the alternative theory for failure to plausibly allege a claim of conversion by failing to allege the requisite demand of the subject property.

#### F.        Count Twelve — Violation of New Jersey's Consumer Fraud Act

In Count Twelve, the plaintiffs assert a claim for a violation of the New Jersey Consumer Fraud Act ("NJCFA"), which provides a remedy for deceptive commercial activities deemed to be "unlawful practice[s]," as defined by the statute.  N.J. Stat. Ann. § 56:8-1, *et seq.*  The Complaint broadly alleges that "[t]he conduct described above of the Walmacs in connection with the sale, purchase, marketing and management of Ready's Image, and these defendants' services with respect to Ready's Image violates the New Jersey Consumer Act."  [Record No. 72 ¶ 141]  The Complaint then asserts that "the Walmacs' conduct has been knowing, deceptive and fraudulent, and their business practices vis-á-vis Plaintiffs have been unconscionable" and that "as a result of said conduct, Plaintiffs have suffered an ascertainable loss."  [*Id.* ¶¶ 142, 143]  Because this claim is deficient for a number of reasons, the plaintiffs' claim  under Count Twelve for violations of the NJCFA will be dismissed.[19]

The NJCFA creates a private cause of action where an individual has suffered an "ascertainable loss" resulting from any unfair or deceptive trade practice in violation of the statute. N.J. Stat. Ann. § 56:8-19.  Specifically, the statute provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

---

[19]      The claims in Count Twelve against Walmac Stud and Jones were ordered to be arbitrated pursuant to the Court's January 2, 2013, Amended Memorandum Opinion and Order.  [Record No. 103, pp. 13, 17]

N.J. Stat. Ann. § 56:8-2.  The NJCFA only applies to sales of "real estate,"[20] and sales of "merchandise."  N.J. Stat. Ann. § 56:8-2.  The term "merchandise" is defined to include "any objects, wares, goods, commodities, *services* or anything offered, directly or indirectly to the *public* for sale."   N.J. Stat. Ann. § 56:8-1(c) (emphasis added).

To state a claim under the NJCFA, a plaintiff must plausibly allege each of the three elements of: "(1) unlawful conduct by the defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Asp v. Toshiba Am. Consumer Prods., LLC*, 616 F. Supp. 2d 721, 734 (S.D. Ohio 2008) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 464-65 (N.J. 1994). Additionally, "[c]laims brought under the NJCFA are subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)."   *Tatum v. Chrysler Group LLC*, No. 10-4269, 2012 U.S. Dist. LEXIS 171746, at *14 (D.N.J. Dec. 3, 2012) (quotation marks and citation omitted).

The plaintiffs have simply failed to plead a cause of action under the NJCFA.  This is even more apparent when the Court examines the claim pleading under the heightened standard of Rule 9(b).  The plaintiffs do not identify with any specificity what conduct supports the cause of action.  Further, they do not identify the alleged actor with particularity.  Instead, the plaintiff use the term "the Walmacs."[21]  Next, while they allege that the conduct has been "knowing, deceptive and fraudulent, and their business practices vis-á-vis Plaintiffs have been

---

20      There is no dispute over the sale of real estate in this action.

21      To the extent the underlying conduct which acts as the basis of the plaintiffs claim for violations of the NJCFA is the same conduct which is the predicate to the plaintiffs' fraudulent inducement claims, the Court incorporates its discussion and analysis here.

unconscionable," the plaintiffs do not identify specific business practices that support their claims.  Instead, the Complaint summarily alleges that "as a result of said conduct, Plaintiffs have suffered an ascertainable loss."  Again, the Court must disregard bare assertions devoid of further factual enhancement and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

In their response to the defendants' motion to dismiss, the plaintiffs argue that the Complaint adequately pleads the elements of a claim under the NJCFA against the Walmacs, including Walmac Farm.  [Record No. 109, p. 24]  The plaintiffs clarify that this claim is predicated on the "sale of services" to the plaintiffs by the defendants, and not based upon the "sale of the stallion," where the plaintiffs were admittedly sellers and not consumers.  [Record No. 109, p. 24]  The plaintiffs then identify – by picking and choosing from the background section of their Complaint  – allegations which they contend supports this claim.[22]  This attempt

---

22      In their Response, the plaintiffs identify the following representations as being the predicate for their NJCFA claim:

> The Walmacs represented that: (a) they could do everything that was necessary to maximize the likelihood of Ready's Image's success; (b) [Defendant John T.L. Jones  III] owned Walmac  Farm, where Ready's Image would reside and be bred; (c) Jones was in  the business of being a 'stallion manager,' a breeding industry professional responsible for breeding and handling stallions; (d) the Walmacs had excellent reputations in the Kentucky thoroughbred breeding community; and (e) the Walmacs were on sound financial footing and had the wherewithal to successfully market Ready's Image in both the Northern and Southern hemispheres, and that they would do so at reasonable rates.

> The Walmacs also represented that they could expose Ready's Image to a book of more than 100 mares in Ready's Image's first breeding season, which – if true – could have generated roughly $1.5 million in stud fees in Ready's Image's first year as a stud. A large book of mares  in Ready's Image's first year as a stud would have been  and  remains essential  to Ready's Image establishing himself as a successful stallion.

[Record No. 109, p. 24 (citations to the Complaint omitted)]

-36-

to piece together a comprehensible claim that passes muster under the pleading standards of Rule 9(b) is insufficient. Even if the Court were to accept the plaintiffs' clarification and argument that they have indeed sufficiently pleaded a claim under the NJCFA, the facts, as alleged, tell another story.

As noted above, to fall under the purview of the NJCFA the "merchandise" must be offered "directly or indirectly to the *public* for sale." N.J. Stat. Ann. § 56:8-1(c) (emphasis added). New Jersey courts have indicated that "'the public,' as used in the this definition of 'merchandise,' refers to 'the public at large.'" *Princeton Healthcare Sys. v. Netsmart New York, Inc.*, 422 N.J. Super. 467, 473 (N.J. Super. Ct. App. Div. Sept. 26, 2011) (quoting *Finderne Mgmt. Co., Inc. v. Barrett*, 402 N.J. Super. 546, 570 (N.J. Super. Ct. App. Div. Sept. 9, 2008); *Marascio v. Campanella*, 298 N.J. Super. 491, 499 (N.J. Super. Ct. App. Div. Mar. 20, 1997)) (citing *Kugler v. Romain*, 58 N.J. 522, 536 (1971) (recognizing that the NJCFA is directed primarily at "deception, misrepresentation and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods"); *539 Absecon Blvd., L.L.C. v. Shan Enterprises Ltd. Partnership*, 406 N.J. Super. 242, 273-80 (N.J. Super. Ct. App. Div. Mar. 26, 2009) (same), *certif. denied*, 199 N.J. 541, (2009)). Additionally, the Third Circuit has held that "the phrase 'anything offered, directly or indirectly, to the public for sale,' was not a catch-all phrase . . . but instead should be construed under the doctrine of *ejusdem generis* as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words which precede it." *J & R Ice Cream Corp.*

-37-

*v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1272 (3d Cir. 1994) (quotation marks and citation omitted).

Further, New Jersey courts have opined that the "the entire thrust of the Act is pointed to products and services sold to consumers in the popular sense." *E. Coast Office Sys. v. Citicorp Vendor Fin., Inc.*, No. 06-24-GEB, 2006 U.S. Dist. LEXIS 82044, at *6-7 (D. N.J. Nov. 9, 2006) (quotation marks and citation omitted). "Thus, the [NJ]CFA is not intended to cover every transaction that occurs in the marketplace, but, rather, its applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." *Id.* at *7 (quotation marks and citation omitted).

In short, the plaintiffs argue that they are "consumers" of a "sale of services" contract concerning the management, marketing, and breeding of Ready's Image as a stud, and that "Walmac Farm marketed itself as the stud farm at which Ready's Image should be boarded and should stand stud." [Record No. 110, p. 25]  The transactions at the heart of this dispute, however, do not involve simple purchases.  An offer of services to manage the stud career of a thoroughbred race horse is certainly not something sold to the general public, but would be a service highly particularized and unique to the particular parties and stallion involved. *See, e.g., Princeton Healthcare Sys.*, 422 N.J. Super. at 473-74 (holding that a contract for the installation and implementation of a complex computer system did not constitute a consumer purchase covered by the NJCFA and noting that "[t]he contract did not provide for simply the installation of a standardized computer software program but rather the design of a custom-made program to satisfy [the plaintiff's] unique needs and [the defendant's] active participation in

-38-

implementation of this program"); *Boc Grp. v. Lummus Crest*, 251 N.J. Super. 271, 279-80 (N.J. Super. Ct. Law Div. Aug. 3, 1990) (holding that a corporation that purchased certain technology and support services through a services and licensing agreement was not protected by the NJCFA because the technology and services were not (1) "available to the public in large quantities" or "mass produced" and (2) had no similarity to the "comprehensive definitions" of goods and services promulgated by the N.J. Division of Consumer Affairs under the NJCFA); *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 561 (D. N.J. Sept. 30, 2002) (finding that the services which the plaintiff consumed, consisting of maintaining accounting records, tracking inventory, and providing data reports, were not things which the defendant sold to the public, but were incidental to a contract for the sale of products and, therefore, was not afforded the protection of the NJCFA); *Shogen v. Global Aggressive Fund, Ltd.*, No. 04-5695-SRC, 2007 U.S. Dist. LEXIS 31093, at *23-24 (D. N.J. Apr. 26, 2007) (holding that a certain loan transaction was not "merchandise" and not available to the "consumer in the popular sense" where it was not "advertised to the public, available to consumers in the ordinary market place, mass produced or available in large quantities," but that it was "more accurately characterized as a rare, specialized and complex transaction, whose availability is restricted to a small number of corporate insiders who hold a significant volume of corporate stock"). The services which the defendants provided to the plaintiffs clearly do not appear to be available to a consumer in the ordinary sense of the word. These agreements between the parties are clearly rare, specialized, and complex, and are only available to a small number of potential purchasers.

-39-

Further, the parties to these agreements are admittedly not unsophisticated parties, unversed in the realities of breeding and racing thoroughbred horses.  *See Finderne Mgmt. Co., Inc.*, 402 N.J. Super. at 571-572 (examining the sophistication of the parties involved to a contract involving a complex financial sheltering scheme and holding that the plaintiffs were not "unsophisticated buyers, victimized after being lured into the agreement" and therefore did  not qualify as a "consumer" as defined by the NJCFA).  James T. Scatuorchio has "devoted his career to the care, development and racing of competitive thoroughbred horses" for "more than the past dozen years."  [Record No. 72 ¶ 17] Additionally, he has "raced and currently owns a minority interest in Ready's Image's father, a well-known and successful racehorse named More Than Ready, who retired from racing and now generates almost $20 million in revenues per year from breeding in both Australia and the United States."  [*Id.* ¶ 21]  Moreover, these parties negotiated and then entered into a number of complex contracts governing the marketing, management, and breeding of Ready's Image.  [*See generally* Record No. 72-1 (containing the multitude of contracts between the parties); Record No. 109, p. 4 (noting that this action "arises out of the parties' intricate series of contractual and commercial relationships related to the ownership and management of a stallion Ready's Image")] And, as noted in the Court's January 2, 2013, Amended Memorandum Opinion and Order, "the plaintiffs were represented by counsel during the execution of the agreements." [Record No. 103, p. 9]  The facts of this case present a very different picture than  that of a seller taking advantage of a naive purchaser.  *See BoC Grp.*,  251 N.J. Super. at 280.  Thus, given the uniqueness of the services, the complexity of the

contractual arrangements, and the sophistication of the parties involved, the Court does not find that this was an offer of services offered to the public within the meaning of the NJCFA.[23]

### G.   Count Fourteen — Rescission and Reformation

Through Count Fourteen, the plaintiffs seek reformation of certain agreements. According to the plaintiffs, this count consists of four distinct sub-claims.  [Record No. 109, p. 26]  Specifically, these sub-claims seek: (1) reformation of the COA to strike the arbitration clause as being unconscionable; (2) reformation of the COA to remove an illegal tax election provision contained in the agreement; (3) reformation of the SHCOA based on an alleged illegal tax election provision provided for in the agreement; and (4) reformation based on challenges to "transfers of co-ownership interests to Four Star Sales, LLC, Kerry Cauthen, and Hengst Funding, LLC (d/b/a Gains-Gentry Stallion Holdings), (collectively "Southern Hemisphere Co-Owners").  [*Id.*]  The first and second of these sub-claims were ordered to be arbitrated pursuant to the Court's Amended Memorandum Opinion and Order.  [Record No. 103, p. 14]

### 1.   Reformation of Tax Treatment "No Partnership" Provision

A court may exercise its equitable powers to reform a contract based on fraud, mutual mistake, or if the contract is illegal.  *Bariteau v. PNC Fin. Servs. Grp., Inc.*, No. 3:06-CV-132-S, 2006 U.S. Dist. LEXIS 79564, at *10-11 (W.D. Ky. Oct. 30, 2006) (quoting *Childers & Venters,*

---

23      The defendants argue that the plaintiffs have "made no effort" to show how New Jersey law "would even be applicable other than to state that some of them live in New Jersey."  [Record No. 110, p. 11]  They also contend that the choice of law of the agreements between the parties was that of Kentucky and that the Court has already determined that Kentucky law applies because of the controlling agreements and choice-of-law analysis.  [Record No. 110, p. 11; Record No. 103, p. 3]  The plaintiffs respond by asserting that the Complaint alleges that the Walmacs reached out to James Scatuorchio in New Jersey, the plaintiffs reside in New Jersey, and that Walmac Farm markets itself in Kentucky.  Because the Court has determined that the NJCFA is inapplicable to the facts as pleaded by the plaintiffs, it is unnecessary to address this argument.

*Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970)); *see also Hopkinsville Motor Co. v. Massie*, 15 S.W.2d 423, 424 (Ky. 1929) ("Where the parties put their engagement in writing all prior negotiations and agreements are merged in the instrument, and each is bound by its terms unless his signature is obtained by fraud or the contract be reformed on the ground of fraud or mutual mistake, or the contract is illegal.").

The plaintiffs allege that the "No Partnership" provision of the SHCOA, contained in Section 13.3, provides for an illegal tax election and is in contradiction of the Internal Revenue Code.  [Record No. 72-1 ¶¶ 162-63; Record No. 109, pp. 27-32]  The plaintiffs contend that, pursuant to 26 U.S.C. § 761, the parties to the SHCOA have illegally elected to be treated as tenants in common for tax purposes, and that they should be treated as a partnership.  Thus, they conclude that this provision of the SHCOA is illegal, and they seek reformation of this contract provision.  Given the limited factual record at this stage in the proceedings, the Court cannot adequately assess the plaintiffs' claim regarding this issue.[24]

### 2. Challenges to Transfers of Co-Ownership Interests to Southern Hemisphere Co-Owners

The second of the plaintiffs' sub-claims arises over the alleged improper transfer of co-ownership interests from Walmac Stud to the Southern Hemisphere Co-Owners which the

---

[24]    Additionally, the parties dispute whether the "limitations period" has expired.  The defendants cite to Section 7.17, the two-year limitations provision, of the COA and argue that the COA was executed on October 24, 2008.  The plaintiffs respond by arguing that the limitations period should be tolled under the "continuing violation doctrine."  The case law the plaintiffs rely on, however, applies this equitable tolling doctrine to cases involving the ADEA, Title VII, and a case from the Ninth Circuit dealing with federal antitrust law.  Regardless, this claim is over the SHCOA and its "No Partnership" provision, and the defendants do not proffer any argument of the applicability of the COA's two-year limitations provision to the SHCOA.

plaintiffs believe took place between October 2, 2008 and April 23, 2009.[25]  [Record No. 72 ¶¶ 49-50, 168]  The plaintiffs allege that they were not given notice of, and did not consent to these transfers of interest.  Additionally, they argue they were not given the right to participate in the sale, nor were they given the right of first refusal to purchase those interests, pursuant to Section 4.2.3 of the COA.  [Record No. 72 ¶¶ 168-70]  The plaintiffs assert that Walmac Stud's transfers of interest breached the COA and that pursuant to Section 4.2.1 of the COA any transfers of ownership interest in violation of the transfer requirements of the contract are "null and void." [*Id.* ¶¶ 170-72]  The plaintiffs conclude that if these transfers of ownership interests are found to be null and void, then the Southern Hemisphere Agreements should be rescinded because those agreements are improperly executed by the Southern Hemisphere Defendants as "co-owners."  [*Id.*, p. 30, para. 1]

The defendants initially argue that this claim is barred by the two-year limitations provision of the COA.  Specifically, Section 7.17 states, in part, that "[n]o Dispute shall be submitted to the arbitration and no action for the breach of any provision of this Agreement or in connection with Ready's Image or the operation hereof may be commenced more than *two years* after the *event giving rise to* such cause of action shall have occurred."  [Record No. 72-1, p. 20 (emphasis added)]  The defendants contend that the plaintiffs had knowledge of these transfers prior to April 23, 2009, because this was the date that the plaintiffs entered into the Southern Hemisphere Agreements with the Southern Hemisphere defendants.  [Record No. 105, p. 22; Record No. 72 ¶ 51]  However, this lawsuit was originally filed on April 1, 2011, in the

---

25    This claim against Walmac Stud was ordered to be arbitrated pursuant to the Court's January 2, 2013 Amended Memorandum Opinion and Order.  [Record No. 103, p. 14]

Superior Court of New Jersey.  [Record No. 1 ¶ 1]  Thus, there is a twenty-three-day period (between April 1, 2009 and April 23, 2009) that transfers of ownership interests could have occurred which would allow them to fall under the two-year limitations provision.  This is a question of fact which cannot be resolved via a motion to dismiss.

The defendants next argue that this claim is expressly contradicted by the terms of the COA because the requirement of "right of first refusal" did not apply to any transfer of ownership interest made prior to July 1, 2009 and, as noted above, these transfers took place prior to April 23, 2009.  The defendants rely on Section 4.2.3 of the COA which states, in part:

> For the period beginning on [October 24, 2008] through July 1, 2009, any Ownership Interest may be sold by an Initial Co-Owner without being subject to the first right to purchase set forth herein; provided that the acquirer of any such Ownership Interest and his, her or its heirs successors or assign shall be subject to such first right to purchase and *provided, further*, that the remaining Initial Co-Owners shall have *the right to participate*, pro rata, *in any such sale*.

[Record No. 72-1, p. 14 (emphasis added)] The plaintiffs' claim alleges that they were not given the right of first refusal *and* were also not given the right to participate in the sale.  If this is true, then the alleged transfers to the Southern Hemisphere defendants would not be provided the protection of Section 4.2.3.  Because the Court must accept all allegations as contained in the Complaint as true when reviewing a motion under Rule 12(c), the defendants' motion to dismiss Count Fourteen will be denied.

**IV.**

For the reasons discussed above, it is hereby

**ORDERED** as follows:

(1)     Defendants' Motion to Dismiss Counts Five, Six, Seven, Eight, Nine, Eleven, Twelve and Fourteen For Failure to State a Claim [Record No. 105] is **GRANTED**, with respect to the following claims and parties:

(a)     Count Seven, as it pertains to Defendant Lincoln-Walmac Associated Farms, Pty Ltd.;

(b)     Count Eight, in its entirety, as it pertains to Defendant Walmac Farm, LLC;

(c)     Count Eight, as it relates to the Mare Agreement, against Defendants Walmac Stud Management, LLC, and John T. L. Jones, III;

(d)     Count Nine, in its entirety, as it pertains to Defendant Saybrook Advertising, LLC;

(e)     Count Eleven, in its entirety, as it pertains to Defendants Walmac Farm, LLC, and Lincoln-Walmac Associated Farms, Pty Ltd.;

(f)     Count Twelve, in its entirety, as it pertains to Defendant Walmac Farm, LLC.

(2)     Defendants' Motion to Dismiss Counts Five, Six, Seven, Eight, Nine, Eleven, Twelve and Fourteen For Failure to State a Claim [Record No. 105] is **DENIED**, with respect to the remaining Counts.

(3)     Plaintiffs' Motion to Strike Attachment to Defendants' Reply in Support of Their Motion to Dismiss [Record No. 112] is **DENIED**, as moot.

This 19th day of April, 2013.



Signed By:

*Danny C. Reeves*

United States District Judge