UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

JAMES T. SCATUORCHIO RACING    )
STABLE, LLC, et al.,    )
    )
    Plaintiffs,    )    Civil Action No. 5: 11-374-DCR
    )
V.    )
    )
WALMAC STUD MANAGEMENT,    )    **MEMORANDUM OPINION**
LLC, et al.,    )    **AND ORDER**
    )
    Defendants.    )

*** *** *** ***

Defendants Walmac Stud Management, LLC ("Walmac Stud"), Walmac Farm, LLC ("Walmac Farm"), John T.L. Jones ("Jones"), and Lincoln-Walmac Associated Farms, Pty Ltd. ("Lincoln-Walmac") have moved for summary judgment regarding a number of remaining claims.[1] [Record No. 213] Plaintiffs James T. Scatuorchio, LLC ("Scatuorchio, LLC"), James T. Scatuorchio ("JTS"), Kevin Scatuorchio, Courtney Sullivan, and Bryan Sullivan ("Sullivan") oppose the motion. Having reviewed the parties' filings, the motion will be granted, in part, and denied, in part.

## I.

The factual and procedural background of this matter has been set out in detail in prior orders. [*See* Record Nos. 103, 127, 267, 268, 271.] This action arises from a series of contracts

---

1    Co-Defendant Saybrook Advertising, LLC is not a party to this motion.

regarding the ownership and stud career of the thoroughbred stallion Ready's Image in both the Northern and Southern Hemispheres. These contracts include the Sale Agreement (also known as the Purchase Agreement), the Stallion Co-Ownership Agreement ("COA"), the Installment Agreement (also known as the Southern Hemisphere Sale Agreement), the Southern Hemisphere Co-Ownership Agreement ("SHCOA"), the Southern Hemisphere Lease Agreement ("SHLA"), and the Mare Agreement. The plaintiffs claim that the defendants violated the relevant agreements and breached their duties of good faith and fair dealing and their fiduciary responsibilities during the transfer of ownership and management of Ready's Image. Conversely, Defendant Lincoln-Walmac has filed two counterclaims seeking to recover unpaid expenses and stud fees allegedly due in the Southern Hemisphere.

A. **The Parties' Agreements**

On October 2, 2008, Plaintiffs Scatuorchio, LLC, and JTS' children, Kevin Scatuorchio and Courtney Sullivan, sold a two-thirds undivided interest in Ready's Image to Defendant Walmac Stud. This agreement was memorialized by the Sale Agreement. [Record No. 72-1, pp. 1-20] These parties also entered into the COA which contains the terms and conditions of the parties' relationship as co-owners of the thoroughbred. [Record No. 72-1, pp. 29-35] Walmac Stud was named as the "Stallion Manager" under the COA and was responsible for the day-to-day management of Ready's Image. Likewise, it was responsible for procuring mares to breed with Ready's Image.

On April 23, 2009, the parties entered into three additional agreements vesting other entities with ownership interests and responsibilities regarding the management of Ready's

Image in the Southern Hemisphere. These agreements included: (i) the Installment Agreement; (ii) the SHCOA; and (iii) the SHLA, (collectively, the "Southern Hemisphere Agreements"). Under these agreements, Defendant Lincoln-Walmac became a co-owner of Ready's Image in the Southern Hemisphere. The SHCOA designated Walmac Stud as the Stallion Manager for all Southern Hemisphere operations. Much like the COA, the SHCOA governed the rights and obligations of the parties having an ownership interest in Ready's Image in the Southern Hemisphere during the stallion's breeding time in Australia.

Under the SHLA, Lincoln-Walmac was also designated as a lessee of the "use, purpose and attributes" of Ready's Image for breeding activities in the Southern Hemisphere for the 2009-2012 breeding seasons. [Record No. 72-1, p. 67] Lincoln-Walmac also assumed responsibility for the care, upkeep, and marketing of Ready's Image in the Southern Hemisphere and was responsible for remitting to the Southern Hemisphere Co-Owners[2] any revenue generated by Ready's Image in the Southern Hemisphere in the form of "Stallion Rent." [*See* SHLA, Record No. 72-1, p. 68 (defining "Stallion Rent").]

After a disappointing first year at stud, the parties became concerned that not enough was being done to promote Ready's Image to potential mare-owners. As a result, on January 20, 2010, Plaintiffs JTS, Kevin Scatuorchio, and Sullivan (collectively, the "Mare Plaintiffs") entered into the Mare Agreement with Defendant Jones, who signed as the Managing Director of Walmac Farm. The Mare Plaintiffs were represented by attorney Richard Schibell when they

---

2       Schedule I of the SHLA identifies Lincoln-Walmac, Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, Hengst Funding, LLC, d/b/a Gaines Gentry Stallion Holdings, Kerry T. Cauthen, and Four Star Sales, LLC, (collectively, "Southern Hemisphere Co-Owners") as holding the ownership interest of Ready's Image in the Southern Hemisphere. [Record No. 72-1, p. 78]

entered into the Mare Agreement. [*See* Record No. 72-1, pp. 80-81 (noting that Schibell is "cc'd" on the Mare Agreement); *see also* Sullivan's Deposition, Record No. 216-6, p. 56.] Neither Plaintiffs JTS nor Sullivan have an individual ownership interest in Ready's Image. Further, Sullivan is only a signatory to the Mare Agreement.

Under the Mare Agreement, the Mare Plaintiffs are entitled to receive the proceeds of any contracts associated with mares delivered by the Mare Plaintiffs to Walmac Farm for breeding with Ready's Image. [*See* Record No. 72-1, pp. 80-81.] More specifically, the Mare Agreement states, in part, that it is agreed that if:

> 1) The "Original Ready's Image Owners" pay shipping costs from another state to and from Kentucky for a mare (hereinafter "Mare") shipped in 2010 to breed to Ready's Image and pay the board and routine veterinary charges for the Mare while boarded in Kentucky for the 2010 breeding and
>
> 2) Have a third party owner sign a breeding contract to breed the Mare, the same mare for which they paid the shipping, board, and veterinary expenses noted above, to Ready's Image, and said breeding contract shall be standard Walmac Farm breeding contract form and shall be for the full advertised stud fee payable when the foal stands and nurses or earlier,

Then the Ready's Image Syndiate shall remit all proceeds from the sale of each contract executed for such mare to the Original Ready's Image Owners.

[Record No. 72-1, p. 80]

The parties do not dispute that the Mare Plaintiffs delivered several mares to Ready's Image for breeding. [Record No. 209-3, p. 20] However, the plaintiffs contend that they have not received a distribution of any resulting proceeds from either Walmac Stud or Walmac Farm.

### B.    Procedural History

Since the plaintiffs initiated this action in New Jersey state court on March 30, 2011, the scope of this litigation has been considerably reduced. Portions of various claims have been referred to arbitration, portions of other claims have been dismissed, and the plaintiffs have abandoned various claims.[3]  [*See* Record Nos. 86, 103, 127.]  Despite the parties' continuing uncertainty regarding which claims the plaintiffs are actively pursuing, as well as the identify of the plaintiffs actually asserting those claims (especially in the case of Sullivan),[4] it appears that the following claims remain:

> (1)    Count 2 for Breach of the Southern Hemisphere Agreements, by Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS (the "plaintiffs") against Lincoln-Walmac;
>
> (2)    Count 3 for Breach of the Mare Agreement by the plaintiffs and Co-Plaintiff Sullivan against Walmac Farm and Walmac Stud;
>
> (3)    Count 5 for Breach of the Covenant of Good Faith and Fair dealing of the Southern Hemisphere Agreements, by the plaintiffs against Lincoln-Walmac;
>
> (4)    Count 6 for Breach of the Covenant of Good Faith and Fair Dealing of the Mare Agreement, by the plaintiffs and Co-Plaintiff Sullivan, against Walmac Farm and Walmac Stud;

---

3       The number of claims remaining before the Court was further reduced after the defendants filed their motion for summary judgment. [*See* Record Nos. 221, 268, 271; *see also* Record No. 238, p. 3.] Specifically, the Court granted the defendants' motion to compel arbitration, ordering Scatuorchio, LLC, Kevin Scatuorchio, JTS, and Courtney Sullivan's fraud and accounting claims against Walmac Farm, as well as their fraud claim against Saybrook to arbitration.  [Record No. 268]  However, because Sullivan is only a party to the Mare Agreement, his accounting and fraud claims (Counts 9 and 10 of the Second Amended Complaint, respectively) remain pending before the Court. [*Id.*]  Additionally, on April 17, 2014, the Court granted Saybrook's motion for summary judgment on Sullivan's fraud claim (Count 10). [Record No. 271]

4       Throughout this litigation the parties have advanced an ever-evolving recitation of the claims being asserted.

(5)     Count 7 for Breach of Fiduciary Duties relating to Ready's Image standing in the Southern Hemisphere, by the plaintiffs against Lincoln-Walmac;

(6)     Count 9 for Accounting, by the plaintiffs against Lincoln-Walmac, and by Co-Plaintiff Sullivan against Walmac Farm, Lincoln-Walmac, Walmac Stud, and Jones;

(7)     Counts 11 for Conversion, 12 for violation of the New Jersey Consumer Fraud Act, and 13 for violation of New Jersey RICO, by Co-Plaintiff Sullivan;

(8)     Count 14 for Rescission/Reformation by the plaintiffs against Lincoln-Walmac relating to the Southern Hemisphere Agreements;

(9)     Counterclaim for Breach of Southern Hemisphere Agreements, by Lincoln-Walmac against Scatuorchio, LLC, Kevin Scatuorchio, and Courtney Sullivan; and

(10)     Counterclaim for Breach of Contract for Unpaid Stud Fees, by Lincoln-Walmac against JTS.

Notwithstanding this appraisal, the plaintiffs provide a more limited assessment of their remaining claims, stating:

[T]he only claims remaining are (1) claims asserted by Plaintiffs James T. Scatuorchio [], Kevin Scatuorchio [], and Bryan [Sullivan] against Walmac Farm, LLC [] under what has been referred to herein as the "Mare Agreement," and (2) claims asserted by Plaintiffs James T. Scatuorchio, LLC [], Courtney Sullivan [], and Kevin [Scatuorchio] against Lincoln-Walmac [] for an accounting, breach of contract, including the covenant of good faith and fair dealing, and breach of fiduciary duty arising out of its conduct in the Southern Hemisphere as nominal "lessee" . . . , but with the rights and duties of a full-fledged stallion manager in that Hemisphere, along with those duties it owed as a Co-Owner.

[Record No. 273, pp. 1, 3, *compare with* Record No. 280, pp. 1-2 (the defendants' pretrial memorandum providing a more expansive assessment of claims remaining).]

Based on these representations, it appears that the plaintiffs intend to only pursue theories of individual liability under specific agreements rather than their previously proposed global

conspiracy theory of liability predicated, in part, on the alleged derivative status of the defendants. Thus, these remaining claims can be divided into two categories: (i) claims involving Ready's Image in the Southern Hemisphere; and (ii) claims involving the Mare Agreement.

## II.

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.

The plaintiffs allege that the defendants breached their contractual obligations concerning the management of Ready's Image in the Southern Hemisphere as well as their duty to remit payment for securing mares to breed with Ready's Image under the Mare Agreement. The defendants contend that the plaintiffs have failed to produce any evidence to either support their

claims. They also argue that the plaintiffs have not rebutted the evidence offered in support of Lincoln-Walmac's counterclaims. Finally, the defendants assert that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on all pending claims.

### A. Breach of Contract and Covenant of Good Faith and Fair Dealing

The elements of a breach of contract claim under Kentucky law are: (i) the existence of a valid contract; (ii) breach of the contract; and (iii) damages or loss to the party alleging breach. *Oliver v. Hilliard*, No. 2010-CA-1138-MR, 2013 Ky. App. Unpub. LEXIS 201, at *14 (Ky. Ct. App. Mar. 1, 2013); *see also Lenning v. Com. Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). Thus, to recover, a party must establish the existence and breach of a contractually imposed duty. *Strong v. Louisville & Nashville R. Co.*, 43 S.W.2d 11, 13 (Ky. 1931). And implicit in every contract in Kentucky is the covenant of good faith and fair dealing which has been interpreted to require the contracting parties to do everything necessary to carry out the contract. *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 816 (E.D. Ky. 2013) (citations and quotation marks omitted). To establish a breach, a complaining party must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x. 451, 458 (6th Cir. 2005).

### 1. Mare Agreement

#### a. Breach of the Mare Agreement (Count 3)

The plaintiffs contend that Walmac Farm and Walmac Stud breached the Mare Agreement.[5] The defendants do not dispute that the Mare Plaintiffs performed under this contract and concede that breeding to Ready's Image generated net proceeds of $79,134.70. However, Walmac Stud and Walmac Farm argue that they are entitled to summary judgment because the amounts owed to the Mare Plaintiffs under the Mare Agreement were properly set-off against amounts Courtney Sullivan, Kevin Scatuorchio, and Scatuorchio, LLC owed under the COA and Installment Agreement. [Record No. 213-1, p. 24]

The Mare Plaintiffs do not dispute that Kentucky law recognizes set-off. However, as the defendants note, "[u]nder this principle, parties are allowed to set-off *mutual* obligations to each other." [Record No. 213-1, p. 24 (emphasis added)] In *Marcum v. Wilhoit*, 162 S.W.2d 10 (Ky. 1942), the Supreme Court of Kentucky stated that:

> The generally applicable law governing the right to set-off is that there must be mutuality of obligation; i.e., the debts must be owing between the same persons and at the same right. There is, however, a generally recognized exception to the rule where to deny a set-off would entail inequity and hardship which its allowance would avert, and in such cases a court of equity will allow such set-off.

*Id.* at 12.

In this action, whether set-off is appropriate remains an open question. More specifically, whether there is a mutuality of obligation is unclear. Although not fully developed in parties' filings, the plaintiffs contend that the Mare Plaintiffs entered into the Mare Agreement in their *individual capacities*. [Record No. 238, p. 29-30] The defendants, however, assert that Jones,

---

5       Counts 3 and 6 of the Complaint assert claims against Walmac Farm and Walmac Stud. [Record No. 72-1, pp. 19, 20] Accordingly, both parties moved for summary judgment. [Record No. 213; *see also* Record No. 280.] However, in their pretrial memorandum, the plaintiffs indicate that they are only pursuing this claim against Walmac Farm. [Record No. 273]

as Managing Director of Walmac Farm, signed the contract on behalf of Stallion Manager Walmac Stud, as its *agent*. [Record No. 213-1, p. 24-25; *see also* Jones' Affidavit, Record No. 205, p. 2 ¶ 8.] Likewise, they contend that the Mare Plaintiffs entered the contract on behalf of the co-owners of Ready's Image. They maintain that JTS signed on behalf of Scatuorchio, LLC, Kevin Scatuorchio signed on his own behalf, and Sullivan signed on the behalf of his wife Courtney Sullivan. [*Id.*]

Unlike the other agreements in dispute, the Mare Agreement does not contain an integration provision. The parties, however, have not addressed the propriety of any parol evidence concerning the identity of the contracting parties. *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 316-17 (6th Cir. 1998) (holding that parol evidence is admissible to determine parties' capacity as a signatory to contract) (applying Michigan law). Thus, summary judgment is not appropriate regarding this claim. *See, e.g., Am. Express Travel Related Serv. Co. v. Accu-Weather, Inc.*, 849 F. Supp. 233, 238 (S.D.N.Y. 1994) ("When the provisions of a contract are susceptible to conflicting constructions and when there is relevant extrinsic evidence of the parties' actual intent, the meaning of the contract is an issue of fact barring summary judgment.).

### b. Breach of the Covenant of Good Faith and Fair Dealing of the Mare Agreement (Count 6)

Walmac Farm and Walmac Stud contend that "[i]t is completely unclear" what Sullivan is asserting as the basis of his breach of the covenant of good faith and fair dealing of the Mare Agreement claim. [Record No. 213-1, p. 27] Notwithstanding this uncertainty, they re-assert their set-off argument. [*Id.*] In response, Sullivan contends that the use of set-off was done in

bad faith and that the proceeds generated by the Mare Agreement were set-off against inflated expenses. [Record No. 238, p. 31] Walmac Farm and Walmac Stud do not specifically address Sullivan's response. [*See* Record No. 256] However, as discussed more fully below, there is no evidence of unreasonable expenses. Therefore, there is no issue of material fact to resolve and summary judgment is appropriate regarding this claim.

### c. Sullivan's Mare Agreement Claims

The defendants separately address Sullivan's claims under the Mare Agreement and contend that they are entitled to summary judgment. [Record No. 213-1, pp. 14-15 (incorporating Record No. 165)] Specifically, they argue that Sullivan has no right to recover under the agreement because he has not individually performed the requisite contractual obligations (*i.e.*, he has personally not paid the shipping, boarding, and veterinary expenses for any mares). The Court, however, previously concluded that this argument is without merit. [Record No. 267] As outlined in the Memorandum Opinion and Order entered March 19, 2014, the defendants are not entitled to summary judgment regarding claims of breach of contract and breach of the duty of good faith and fair dealing asserted by Plaintiff Sullivan.

### 2. Southern Hemisphere Agreements

Lincoln Farm Pty Ltd. ("Lincoln Farm") owns a 50% share of Lincoln-Walmac, which owns 25% of Ready's Image in the Southern Hemisphere. Nicholas W. Posa is the manager of Lincoln-Walmac. Under the SHLA, Lincoln-Walmac sells breeding nominations for Ready's Image in the Southern Hemisphere. Lincoln-Walmac receives payment for these services at the

rate of ten times the advertised sale price for a breeding nomination. Concerning income and compensation, the SHLA specifically provides:

> Lessee [Lincoln-Walmac] shall pay Lessors [the Southern Hemisphere Co-Owners] promptly and in arrears, without credit, refund, offset, counterclaim, or deduction, as rent (the "Stallion Rent"), for the lease of the Southern Hemisphere breeding uses/purposes/attributes of Ready's Image, for each Lease Year of the Lease Term, an amount equivalent to all collected and nonrefundable/non-repayable revenues . . . as a result of the sales of nominations to Ready's Image for each Lease Year, less an amount equal to the greater of (i) Sixty-Five Thousand Dollars U.S. ($65,000.00 U.S.D.), or (ii) ten times the advertised stud fee (net of G.S.T.), for one southern hemisphere nomination to Ready's Image during such Lease year . . . . Provided however Lessee [Lincoln-Walmac] may set off from Stallion Rent, any expenses of or for Ready's Image, which Lessee has paid/advanced and which are the responsibility of the Lessors . . . .

[Record No. 72-1, p. 68 ¶ 2]

The SHLA also allows Lincoln-Walmac as Lessee to set the advertised stud fee for each season. [*Id.*] Additionally, Lincoln-Walmac may "offer reasonable discounts for the breeding of multiple mares to Ready's Image, enter into foal sharing and mare sharing arrangements to approved mares with nominations, in its reasonable discretion." [*Id.*]

The plaintiffs allege that Lincoln-Walmac did not perform its role properly and abused the discretion afforded to it under the SHLA. Lincoln-Walmac contends that it is entitled to summary judgment on the plaintiffs' claims that it breached the Southern Hemisphere Agreements and the covenants of good faith and fair dealing, relating to proper allocations and distributions of income and expenses. Further, it contends that it is actually owed money from the plaintiffs for unpaid stud fees and expenses.

### a. Breach of the Southern Hemisphere Agreements (Count 2)

The plaintiffs allege that Lincoln-Walmac breached the Southern Hemisphere Agreements by acting in a manner contrary to the agreements' terms. Essentially, the plaintiffs allege that: (i) Lincoln-Walmac failed to collect all stud fees due in the Southern Hemisphere; and (ii) the expenses charged to the Southern Hemisphere Co-Owners were not reasonable. The plaintiffs also assert, as a result, Lincoln-Walmac failed to remit or credit their accounts for the appropriate and full share of revenues due and have never provided a cash distribution for any Southern Hemisphere breeding season. [Record No. 238, pp. 27-28]

The parties do not dispute that Lincoln-Walmac was authorized to deduct its fee and Southern Hemisphere expenses from the income distributed to the Southern Hemisphere Co-Owners. However, the plaintiffs contend that Lincoln-Walmac has failed to collect roughly $130,000.00 in stud fees generated from nominations sold to its parent company, Lincoln Farm. [*Id.*, p. 27] Lincoln-Walmac admits that it sold nominations to Lincoln Farm and does not refute that portions of the stud fees have not been collected from those sales. However, it claims that this does not constitute a breach of the parties' agreements. Despite this claim, Lincoln-Walmac concedes that, under the parties' agreements, "[it] was responsible for collections [of revenues generated from stud fees] in the Southern Hemisphere." [Record No. 256, p. 12] Thus, whether its failure to collect outstanding stud fees from Lincoln Farm constitutes a breach is disputed. Additionally, once resolved, the parties' accounts may be adjusted for any potential revenues due or owed.

-13-

The plaintiffs also maintain that the expenses charged by Lincoln-Walmac in the Southern Hemisphere were unreasonable. [Record No. 238, p. 27] The only specific allegation supporting this claim is that "Lincoln-Walmac passed through inflated Saybrook advertising bills in 2009 without a review for reasonableness." [*Id.*] However, the plaintiffs have made clear that "[a]llegations related to the Saybrook advertising charges in the Southern Hemisphere will not be raised in this trial." [Record No. 273, p. 3] Nonetheless, even if the plaintiffs were to offer Saybrook's bills as unreasonable, there is no evidence concerning the reasonableness of advertising expenses in the Southern Hemisphere. Due to the lack of evidence supporting this allegation, there is not an issue of material fact that must be resolved. Thus, Lincoln-Walmac's motion will be granted regarding the reasonableness of advertising charges in the Southern Hemisphere but will be denied regarding its alleged failure to collect outstanding stud fees.

### b. Breach of the Covenant of Good Faith and Fair Dealing of the Southern Hemisphere Agreements (Count 5)

As noted above, a covenant of good faith and fair dealing is implied in every contract. It imposes upon the parties a duty to do everything necessary to carry out the agreement. *Ram Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 585 (Ky. 2003). As a result, no party may act to "prevent[] the creation of the conditions under which . . . payment would be due." *Oden Realty Co. v. Dyer*, 45 S.W.2d 838, 840 (Ky. 1932) But the "implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights." *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *see also Hunt Enters. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997) (the covenant of good faith and fair dealing, "does not preclude a party from enforcing the terms of

the contract . . . . It is not 'inequitable' or a breach of good faith and fair dealing in a commercial setting for one party to act according to the express terms of a contract for which it bargained"). Put another way, "a party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing." *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997).

The plaintiffs contend that Lincoln-Walmac breached its implied covenant of good faith and fair dealing by: (i) unreasonably setting the advertised stud fees in the Southern Hemisphere too high and, therefore, improperly inflating its own fee; (ii) offering and selling nominations to its parent company, Lincoln Farm, at an unreasonably discounted price and at a price lower than those offered to the plaintiffs; (iii) making no effort to recoup payment from Lincoln Farm for outstanding stud fee payments; and (iv) continuing to sell nominations to Lincoln Farm after it had failed to pay for any nominations previously purchased. [Record No. 238, pp. 28-29] The plaintiffs argue that these actions "denied [them] the benefit of the bargain struck," and breached the implied covenant of good faith and fair dealing. [*Id.*, p. 28]

The explicit terms of the SHLA require Lincoln-Walmac to set the advertised stud fee. [Record No. 72-1, p. 68 ¶ 2 (stating that the advertised stud fee "*shall* be established by the Lessee [Lincoln-Walmac]") (emphasis added)] Likewise, the SHLA set Lincoln-Walmac's yearly compensation at the greater of either $65,000.00 or ten times the advertised stud fee collected from the sale of nominations to Ready's Image for that season. [*Id.*] The SHLA also contemplates that there will be a difference between the contracted stud fee and the advertised stud fee. [*Id.*] Moreover, the SHLA vested Lincoln-Walmac with the ability to offer "reasonable

discounts for the breeding of multiple mares to Ready's Image" and allowed it to enter into foal and mare sharing programs "in its reasonable discretion."  [*Id.*]

The plaintiffs do not dispute these points.  In fact, they cannot since the SHLA explicitly provides for this arrangement.  Instead, they contend that Lincoln-Walmac abused its contractual discretion.  [Record No. 238, p. 29]  The plaintiffs argue that contractual discretion is not "unbridled" but is "tempered by the implied covenant of good faith and fair dealing and the reasonable expectations of the parties."  [Record No. 238, p. 28 (quoting *Wilson v. Ameranda Hess Corp.*, 168 N.J. 236, 251 (N.J 2001) (interpreting New Jersey law))[6]]

There is no evidence that Lincoln-Walmac acted in bad faith, or in an arbitrary, capricious, or unreasonable manner.  Rather, it complied with the unambiguous terms of the SHLA that provided the unilateral discretion to set the advertised stud fee and provide discounts to parties breeding multiple mares.  *Farmers Bank*, 171 S.W.3d at 11.  Moreover, the SHLA specifically dictates the manner in which Lincoln-Walmac's fee would be calculated.  The

---

6      Despite New Jersey law not controlling in this matter, the *Wilson* court further indicated that:

At the same time, the test must recognize the mutuality of expectation and enforce a party's contractual right to exercise discretion in setting prices based on its own reasonable beliefs concerning business strategy. In that setting, an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive. . . . Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.  Bad motive or intention is essential, for, as stated by the United States Court of Appeals for the Seventh Circuit, "[c]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper."

*Wilson*, 168 N.J. at 251 (quotation and citation omitted) (interpreting New Jersey law); *id.* at 254 (holding that "unless [the defendant] provides an explanation for its pricing [*i.e.*, the discretionary provision of the parties' agreement] that is not arbitrary, capricious, or unreasonable, then plaintiffs will have established a jury question on their claim for breach of the implied covenant of good faith and fair dealing").  The plaintiffs' claims fail to meet this standard.

parties were free to negotiate different terms and a different formula for calculating Lincoln-Walmac's compensation (*i.e.,* basing compensation upon the actual stud fees charged) but they did not. In short, the plaintiffs may not at this time re-write the unambiguous, agreed-upon language of the SHLA under the guise of an implied covenant of good faith and fair dealing.

Additionally, Lincoln-Walmac provides uncontested evidence that refutes the plaintiffs' allegation. Specifically, Posa, *via* affidavit, stated that the advertised stud fee in the Southern Hemisphere was reasonable. [Record No. 213-1, p. 26 (citing Posa's Affidavit, Record No. 203, p. 4 ¶ 18)] He represented that this fee was based on his knowledge and experience and in consultation with the Stallion Manager for Ready's Image. [Record No. 203, p. 4 ¶ 18)] Posa explained that advertised stud fee is "an asking price" and almost never the same as to the average price received. [*Id.*] Additionally, the discounts provided to Lincoln Farm were the result of it breeding multiple mares to Ready's Image.[7]

Lincoln-Walmac also explains that it was justified in continuing to sell nominations to Lincoln Farm at a discounted rate despite Lincoln Farm having an unpaid balance. Lincoln-Walmac represents that Lincoln Farm was justified in not paying based on amounts owed to it. [Record No. 256, p. 6] Additionally, the decision to continue to sell nominations was inherently reasonable compared to not booking those nominations at all. Ready's Image was not being booked for its maximum number of nominations and Lincoln-Walmac understood that it would

---

[7]     The nominations sold to Lincoln Farm were discounted no differently than nominations provided to others. In 2009 and 2010, Ready's Image's advertised stud fee was $10,000.00. In 2009, JTS bred five mares for $6,600.00 each and Lincoln Farm bred eight mares for $5,500.00. [Record No. 244-63, pp. 11-12] The $1,100.00 difference resulting from Lincoln-Walmac bringing three additional mares. [Record No. 203, p. 5 ¶ 21] In 2010, JTS bred three mares and Lincoln Farm bred six mares. [Record No. 244-63, pp. 8-9] Despite Lincoln Farm breeding three additional mares, both parties' stud fee was $4,400.00 per mare.

be paid by Lincoln Farm once the farm was paid for expenses owed related to Ready's Image. [*Id.*] And, like Lincoln Farm, the plaintiffs were allowed to pay on a deferred payment arrangement even though they were thought to have been in default at the time on their obligations under the SHLA to Lincoln-Walmac. [*Id.*; *see also* JTS' Affidavit, Record No. 208-2, pp. 194-97; Record No. 244-63, p. 9, 11.]

Lincoln-Walmac, however, provides no evidence regarding amounts allegedly due to Lincoln Farm, therefore, justifying Lincoln-Walmac's failure to collect outstanding stud fees. In light of the lack of evidence to support Lincoln-Walmac's position, summary judgment will not be granted on the plaintiffs' claim that this defendant breached the covenant of good faith and fair dealing by not collecting outstanding stud fees from Lincoln Farm.

Regarding the plaintiffs' other assertions underlying their breach of covenant claim, Lincoln-Walmac provides evidence that the actions (or inactions) of which the plaintiffs complain were premised on legitimate business reasons and within its discretion under the SHLA. Although the plaintiffs complain that Lincoln-Walmac's actions constitute self dealing, a party may act in its own interest and not breach the covenant of good faith and fair dealing, as long as its discretion is not used in a way that is contrary to the spirit of the agreement. Further, there is no evidence that Lincoln-Walmac denied the plaintiffs the benefit contemplated by their agreement; that is, to breed Ready's Image to a full book of mares at the highest price possible.

Other than a general citation to the 2009-2012 Southern Hemisphere spreadsheets that summarize the breeding activity and revenue generated by Ready's Image, the plaintiffs provide no evidence to support their allegations or refute the evidence offered by Lincoln-Walmac.

[Record No. 238, p. 29]  The plaintiffs failure to provide significant probative evidence of a genuine dispute is fatal to these claims.  *Chao*, 285 F.3d at 424.  A reasonable factfinder could not conclude that Lincoln-Walmac acted in bad faith when it: (i) exercised its contractual rights to set the advertised stud fee and collect its own fee in compliance with the framework dictated by the SHLA; (ii) sold nominations at a reduced price to Lincoln-Farm; or (iii) continued to sell nominations to Lincoln Farm despite it having an outstanding balance.

### 3.  Lincoln-Walmac's Counterclaims

Lincoln-Walmac has filed counterclaims, alleging that: (i) the plaintiffs have breached the Southern Hemisphere Agreements; and (ii) it is owed money for unpaid expenses and stud fees.[8]  Lincoln-Walmac contends that, during 2009 and 2010, the revenues generated by Ready's Image in the Southern Hemisphere were sufficient to cover the plaintiffs' portions of the expenses.  [Record No. 213-1, p. 11 (citing Posa's Affidavit, Record No. 203)]  However, after April 2011, these revenues were insufficient to cover these expenses.  Consequently, Lincoln-Walmac began billing the Southern Hemisphere Co-Owners for their share.[9]

---

[8]     Regarding the defendants' assertion that Walmac Stud has filed a counterclaim "for unpaid amounts owed to [it] from Plaintiffs," the Court has reviewed the record and is unable to locate any such claim. [Record No. 280, p. 1]

[9]     Specifically, Lincoln-Walmac alleges that Scatuorchio, LLC, Courtney Sullivan, and Kevin Scatuorchio breached the Southern Hemisphere Agreements by not paying their *pro rata* share of expenses and JTS has failed to pay the fees owed for mares bred to Ready's Image.  Lincoln-Walmac represents that JTS owes AUS $42,600.00 for unpaid stud fees for five mares he bred to Ready's Image in Australia. Additionally, through February 2013, the amounts owed from the plaintiffs for their *pro rata* share of unpaid expenses, less credits, was: (i) Courtney Sullivan AUS $27,238.39; (ii) Kevin Scatuorchio AUS $27,238.39; (iii) Scatuorchio, LLC AUS $49,257.51.  [Record No. 213, p. 12 (citing Posa's Affidavit)]  These amounts accrue interest at a contract rate of 1% per month.

The parties do not dispute that Scatuorchio, LLC, Kevin Scatuorchio, and Courtney Sullivan are parties to the SHCOA and SHLA which govern their rights and obligations in the Southern Hemisphere or that, under these agreements, they are responsible for paying all of Ready's Image's Southern Hemisphere expenses in accordance with their *pro rata* ownership interest. [*See* Record No. 72-1, pp. 68-69 ¶ 4.] It is also undisputed that the plaintiffs have never voluntarily paid their portion of the Southern Hemisphere expenses. Instead, they argue that Lincoln-Walmac's motion for summary judgment on its counterclaims should be denied because: (i) Lincoln-Walmac was the first breaching party and cannot seek to benefit after its breach; and (ii) genuine issues of material fact remain regarding this claim.

Under Kentucky law, the party "who commits the first breach of a contract is deprived of the right to complain of a subsequent breach by the other party." *Fay E. Sams Money Purchase Pension Plan v. Jansen*, 3 S.W.3d 753, 754 (Ky. Ct. App. 1999). When a party feels that the other contracting party breached an agreement, the non-breaching party may either: (i) stop performance and assume the contract has ended without being liable for breach; or (ii) continue performance and sue for damages. *Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. 3:05CV-515-H, 2005 U.S. Dist. LEXIS 29411, at *11 (W.D. Ky. Nov. 21, 1995) (citations omitted). However, "[u]nder no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits." *Id.* at *11-12; *see also V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1196 (S.D.N.Y. 1994) (where a party to a contract has actual knowledge of another party's breach and continues to accept the benefits of the contract, the non-breaching party has waived its claim).

Disregarding whether Lincoln-Walmac breached the Southern Hemisphere Agreements (a disputed issue), the plaintiffs cannot shield themselves from liability based on the "first to breach" doctrine. After Lincoln-Walmac allegedly breached the Southern Hemisphere Agreements, the plaintiffs continued to use Lincoln-Walmac to act as the *de facto* Stallion Manager, to pay Ready's Image's expenses and sell nominations. Thus, under basic principles of Kentucky contract law, the plaintiffs may not avoid their obligations under the agreements and continue to take advantage of the contract's benefits.

Alternatively, the plaintiffs argue that there remains material issues of disputed fact regarding the amount of damages Lincoln-Walmac has allegedly incurred. The plaintiffs contend that the actual income and expenses for Ready's Image are disputed. Further, they dispute how Lincoln-Walmac calculated distributions and expenses. [Record No. 238, pp. 36-37] Lincoln-Walmac has not responded to the plaintiffs' alternative argument concerning damages.

As noted above, the plaintiffs have not offered evidence supporting their argument that the expenses charged by Lincoln-Walmac were unreasonable. However, while not explicitly stated, the plaintiffs also presumably rely on the contention that Lincoln-Walmac failed to collect stud fee payments from its parent company Lincoln Farm as well as their other allegations as a basis of their breach of contract and fiduciary duty claims. The plaintiffs also cite the deposition of Walmac Farm's controller, Sarah Clark, presumably for her testimony that Lincoln-Walmac has failed to pay the Ready's Image Syndicate under the Southern Hemisphere Agreements,

resulting in a debt due of approximately $200,000.00.[10]  [Record No. 244-31, p. 54]  Clark, however, made it very clear that she does not provide accounting services for the Southern Hemisphere and does not participate in Lincoln-Walmac's collection of receivables.  [*Id*., pp. 54-55] Nonetheless, because Lincoln-Walmac has failed to respond to the plaintiffs' arguments and because issues concerning Lincoln-Walmac's own alleged breaches of the Southern Hemisphere Agreements are disputed, summary judgment on this claim will be denied.

### B.  Breach of Fiduciary Duty (Count 7)

The plaintiffs seem to base their breach of fiduciary duty claims against Lincoln-Walmac on the same alleged activities that support their breach of contract and covenant of good faith and fair dealing claims regarding the Southern Hemisphere Agreements.  [Record No. 238, pp. 22-27]  They argue that they have shown that Lincoln-Walmac used Ready's Image for its own profit in the Southern Hemisphere while charging other Southern Hemisphere Co-Owners for expenses, contrary to its contractual and fiduciary duties.  [*Id.*]  The parties do not substantively address these claims.  Rather, they focus on the existence of a fiduciary relationship.

In previously addressing the defendants' motion to dismiss, the Court held that, standing alone, neither Lincoln-Walmac's status as a co-owner nor its role as the *de facto* Stallion Manager would support a finding that a fiduciary relationship existed.  [Record No. 127, pp. 18-20]  However, the Court questioned whether the combination of co-ownership and management

10      The plaintiffs cite to a spreadsheet summarizing all revenue, deductions, expenses, payments, distributions, etc., by Lincoln-Walmac for all of Ready's Image's activity in the Southern Hemisphere for 2009-2012 in support of this argument.  [Record No. 238, p. 36 (citing "Ex. 57,"Record No. 244-63)]  Additionally, the plaintiffs cite to their third supplemental discovery responses to Saybrook's  first set of discovery requests [Record No. 238, p. 36 (citing "Ex. 12 at 56," Record No. 244-12, p. 56)], which in turn cites to the entirety of Sarah Clark's 294 page deposition transcript.  Provided Lincoln-Walmac's failure to respond, judgment in its favor is not appropriate.

could create a fiduciary relationship. [*Id.*, pp. 15-21] The defendants' motion to dismiss was subsequently denied due to the limited factual record before the Court. [*Id.*, p. 21]

The plaintiffs do not add much to their argument in support of their claim at the summary judgment stage. Rather, they rely heavily upon Lincoln-Walmac's status as a co-owner and alleged *de facto* Stallion Manager in the Southern Hemisphere. [Record No. 238, pp. 22-27] Further, through the plaintiffs' pretrial memorandum, it appears that the plaintiffs also contend that Lincoln-Walmac acted as the plaintiffs' agent in the Southern Hemisphere. [Record No. 273, pp. 7-8] However, these are distinct legal concepts. *Crestwood Farm Bloodstock, LLC v. Everest Stables, Inc.*, 864 F. Supp. 2d 629, 639 (E.D. Ky. 2012).

### 1. Fiduciary Duty

A fiduciary relationship creates the "highest order of duty imposed by law." *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002). It is a relationship that is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Caudill v. Salyersville Nat'l Bank*, No. 2008-CA-017-MR, 2010 Ky. App. LEXIS 1, at *9 (Ky. Ct. App. Jan. 8, 2010). Determining whether a fiduciary relationship exists is a fact intensive inquiry that requires the consideration of a number of factors. This includes whether the nature of the relationship imposed a duty to act primarily in the principal's interest, even if any such action were to the detriment of the fiduciary. [Record No. 127, pp. 15-21]; *see also Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).

Under Kentucky law, to establish the existence of a fiduciary duty, a party must demonstrate that: (i) the parties' relationship existed prior to the transaction that is subject of the claim; (ii) the reliance was not merely subjective but reasonable; and (iii) the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary. *In re Salle*, 286 F.3d at 892; *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, No. 2010-SC-533-DG, 2013 Ky. LEXIS 579, at *33-35 (Ky. Nov. 21, 2013). A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing. *See In re Salle*, 286 F.3d at 891; *see also Gresh v. Waste Servs. of Am.*, 311 F. App'x 766, 771 (6th Cir. 2009); *Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n*, 242 S.W.3d 359, 365 (Ky. Ct. App. 2007) ("An ordinary business relationship or an agreement reached through arm's length transactions cannot be turned into a fiduciary one absent factors of mutual knowledge of confidentiality or the undue exercise of power or influence." (quotation marks and citation omitted)). "Only in rare commercial cases is it reasonable to believe the other party will put your interests ahead of their own." *In re Salle*, 286 F.3d at 892. Rather, "*extraordinary facts are necessary*" to support such a belief. *Id.*; *see also Crestwood Farm Bloodstock v. Everest Stables*, Nos. 13-5688/13-5689, 2014 U.S. App. LEXIS 8751, at *14-15 (6th Cir. May 9, 2014).

Lincoln-Walmac argues that the plaintiffs cannot demonstrate that a fiduciary relationship exists. Further, it asserts that the plaintiffs have failed to identify any specific and extraordinary facts to support their contention that Lincoln-Walmac would act primarily in their interest to its own detriment. [Record No. 213-1, pp. 29-30] Conversely, the plaintiffs contend that Lincoln-Walmac owed all of the Southern Hemisphere Co-Owners (including the plaintiffs) a fiduciary

duty. They argue that, although Lincoln-Walmac's role under the SHLA is described as a "Lessee," the title is only nominal and that Lincoln-Walmac possessed all of the rights and duties of the Stallion Manager in the Southern Hemisphere. [Record No. 238, pp. 22-26] The plaintiffs assert that "the evidence shows that the combination of co-ownership and management created a fiduciary relationship that imposed fiduciary duties on Lincoln-Walmac." [*Id.*, p. 23]

*Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 2014 U.S. App. LEXIS 8751, is instructive regarding this claim. There, the Sixth Circuit examined a number of claims arising from various boarding, breeding, and selling agreements between Plaintiff Everest Stables, Inc. ("Everest"), a Minnesota corporation that bred and raced thoroughbred horses, and Defendant Crestwood Farm Bloodstock ("Crestwood"), a thoroughbred farm in Lexington, Kentucky. *Id.* Under one of these agreements, Everest transferred ownership of more than 100 horses to Crestwood. In return, Crestwood agreed to take responsibility for the horses' day-to-day care and attendant costs (*i.e.*, boarding, veterinary, and sale preparation) and sell the horses at public auction or private sale.[11] *Id.* at *2-3. Crestwood was allowed to keep 25% to 50% of the sale proceeds as payment. *Id.* Under the same agreement, Crestwood agreed to prepare and auction two other horses owned by Everest in the same manner as the other horses. *Id.* at *3-4. Following the sale, disagreement over each party's alleged non-performance led to Everest filing suit, alleging, *inter alia*, breach of fiduciary duty.[12]

---

11      Everest had an ownership interest in these horses. [Record No. 238, p. 25]

12      Independent of the disagreement concerning the sale agreement in *Crestwood Farm*, there was another alleged implied contract for the boarding and breeding of a stallion named "Petitionville" which was owned by Everest. 2014 U.S. App. LEXIS 8751, at *6-8. Everest claimed that Crestwood breached the parties' implied contract concerning this stallion, as well as alleged fiduciary and agency duties. *Id.* The court, however, concluded that the parties did not enter into a stallion management agreement for Petionville

In reviewing the parties' relationship, the Sixth Circuit agreed that Everest had failed to demonstrate the requisite "extraordinary facts" necessary to impose fiduciary duties on Crestwood. *Id.* at *15-16. The court was unpersuaded by Everest's assertion that the owner and operator of Crestwood was a "trusted advisor, agent and friend for 15-years" that "sold stud seasons and collected stud fees on Everest's behalf," and knew that Everest's owner was "seriously ill and wanted to make sure his family was provided for" through the proceeds of their transactions. *Id.* at *15. Instead, the court concluded that the parties' relationship was like "any ordinary business relationship," consisting of a series of arm's length transactions. Both parties were for-profit businesses, represented by counsel, duly compensated, and the contract was entered into for their mutual benefit. *Id.* at *15-16. The court held that under the circumstances, it was unreasonable for Everest to believe that Crestwood would act primarily for Everest's benefit and to its own detriment. Therefore, no fiduciary relationship existed.

In this case, the plaintiffs contend that Lincoln-Walmac's status as a 25% co-owner of Ready's Image in the Southern Hemisphere along with the managerial duties it assumed under the terms of the SHLA created a fiduciary relationship. [Record No. 238, p. 22-23] They maintain that the SHLA placed Lincoln-Walmac in the position to oversee and manage Ready's Image's breeding career in Australia, including the oversight of all income, expenses, and to distribute revenue, securing breeding agreements, as well as the overall care of Ready's Image. [*Id.*, p. 23-25] The plaintiffs argue that they reasonably relied on Lincoln-Walmac to act in their best interests and primarily for their benefit when undertaking these responsibilities since it had

---

and, therefore, Everest's claims concerning the stallion were without merit. *Id.* at *7-8.

control over "their valuable property" while Ready's Image "was on the other side of the world." [*Id.*, p. 24] Other than Lincoln-Walmac's dual status and the geographical distance of Australia, the plaintiffs do not identify any other evidence in support of their claim. [*See* Record No. 238.]

The plaintiffs are unable to demonstrate that extraordinary facts exist to warrant a belief that a fiduciary relationship with Lincoln-Walmac existed. A review of the parties' relationship indicates a series of arm's-length transactions. The parties include commercially sophisticated individuals and for-profit businesses. They have devoted their careers to the racing and development of thoroughbred horses and are not naïve to the risks inherent in the thoroughbred stallion industry. [*See* Record No. 72, p. 4 ¶ 17; JTS' Deposition, Record No. 208-2, pp. 40-42.] The plaintiffs were represented by counsel when they entered into these various intricate, highly-detailed, interconnected contracts regarding the ownership and breeding of Ready's Image in both the Northern and Southern Hemispheres. JTS was also personally involved in the negotiations of the terms of parties' agreements. [Record No. 208-2, pp. 137-38, 139-40]

Further, the plaintiffs acknowledge that the breeding of Ready's Image is a business, not a hobby. This is reflected by the terms of the parties' agreements. For instance, through the Installment Agreement (which was fully incorporated into the SHLA), the parties represented and warranted that: (i) their ownership in the stallion was for the business use of breeding horses; (ii) they have sufficient knowledge and experience to evaluate the risks and merits of ownership; (iii) they were financially able to assume and pay their portion of expenses; (iv) they were aware of the economic risks attendant to ownership and its speculative nature; (v) they are

thoroughbred breeders/owners; and (vi) no partnership was created. [Record No. 72-1, p. 46 ¶¶ 8, 9.7]

The Southern Hemisphere Agreements also defined, in detail, the nature of the parties' relationship, explicitly delineating their duties, rights, and obligations. [*See* Record No. 72-1, pp. 69-72; *Id.*, pp. 39-42, 54-55, 56.] Where, as here, commercially sophisticated parties enter into arm's-length business agreements, Kentucky courts have routinely found that such commercial transactions do not establish fiduciary relationships. *See, e.g.*, *In re Sallee,* 286 F.3d at 892; *Crestwood Farm*, 864 F. Supp.2d 629, 639-40 (E.D. Ky. 2012) *aff.'d* 2014 U.S. App. LEXIS 8751 (6th Cir. May 9, 2014); *Marcus & Millichap Real Estate Inv. Brokerage Co. v. Skeeters*, 395 F. Supp. 2d 541, 552 (W.D. Ky. 2005). Notably, none of the contracts in issue expressly or impliedly contain any provision supporting the creation of a fiduciary relationship. Likewise, the contracts do not indicate that Lincoln-Walmac will act primarily in the interest of others to its own detriment. *See Marcus & Millichap Real Estate*, 395 F. Supp. 2d at 552 (holding that no fiduciary relationship existed where governed by the parties' agreement and there was a lack of an express provision in the agreement indicating the existence of a fiduciary relationship).

The plaintiffs also argue that they "had no control over [Ready's Image]" while in Australia and ceded all control to Lincoln-Walmac. [Record No. 238, p. 24] However, this argument ignores the explicit terms of the SHLA. Although Lincoln-Walmac was provided the discretion to set the advertised stud fee and the ability to sell nominations to Ready's Image in the Southern Hemisphere under the lease terms of the SHLA, all of the responsibilities Lincoln-

Walmac undertook were "subject to Walmac's overall responsibilities as stallion manager." [Record No. 238, p. 24 (citing SHLA, Record No. 72-1, pp. 69-71 ¶ 6)] Additionally, the plaintiffs reserved a number of rights concerning Ready's Image under the SHLA, including the ability to inspect the stallion at any time, inspect its books and records, and receive billing and breeding statements from Southern Hemisphere activities. [*Id*.] Thus, not only did the plaintiffs retain control of Ready's Image indirectly through their Stallion Manager, they maintained a degree of direct control as well.

Finally, all parties were to be duly compensated under the terms of the parties' contractual arrangement in the Southern Hemisphere. Under the SHLA, the plaintiffs would receive a portion of the revenues generated from the Southern Hemisphere activities. As Lessee, Lincoln-Walmac would receive either a portion of the advertised stud fee or a flat rate of $65,000.00. Although the plaintiffs contend that the SHLA was intended to solely benefit the plaintiffs, they ignore the possibility that successful breeding seasons could potentially warrant a higher advertised stud fee and result in a higher fee collected by Lincoln-Walmac. When the parties entered into these agreements, they intended that a mutual benefit would result from the relationship. The plaintiffs relied on Lincoln-Walmac's established breeding operations in Australia while Lincoln-Walmac relied on the plaintiffs to supply Ready's Image. Provided the mutual benefit derived from the SHLA, the finding of a fiduciary relationship would be inappropriate. *See, e.g., Marcus & Millichap Real Estate*, 395 F. Supp. 2d at 552.

## 2.     Partnership and Joint Venture

The plaintiffs also argue that the parties' relationship in the Southern Hemisphere is essentially that of a partnership or joint venture.  [Record No. 238, p. 24 (citing *Abbott v. Chesley*, 413 S.W.3d 589 (Ky. 2013) (while a partnership contemplates continuing business, a "joint enterprise is an informal partnership, existing for a limited purpose and duration . . . .  The liability that would attach under either a partnership theory or a joint enterprise is the same because both theories are unequivocally the same"))]  However, the formation of a partnership or joint venture is contrary to the explicit terms of the parties' contracts.   The Southern Hemisphere Agreements state in several places that the parties do not intend to be  partners and understand they are not partners.  [*See* Installment Agreement, Record No. 72-1, p. 47 ¶ 9.7 ("The SH Licences is not a partnership between the Sellers and Purchasers."); SHCOA, *Id.*, p. 54 ¶ 1 ("SH Co-Owners hereby agree to own, hold and operate their rights and interests under the [Installment Agreement] as tenants in common, and not as partners or joint venturers."); SHLA, *Id.*, p. 74 ¶ 9.9 ("This Agreement is a lease only, and the relation between the Lessors and Lessee is one of lessor and lessee, and not one of partnership.").]  Rather, the Southern Hemisphere Co-Owners are tenants in common, as defined by their contracts and Kentucky law. *See KNC Investments, LLC v. Lane's End Stallions, Inc.*, 504 F. App'x 467, 468 (6th Cir. 2012) ("Kentucky law treats owners of horse-ownership syndicates as tenants in common.") (citations omitted).

The parties agreed to structure their relationship with Lincoln-Walmac in the Southern Hemisphere as a lease, not a partnership or joint venture.  *See, e.g., Gresh v. Waste Servs. of Am.*,

311 F. App'x. 766, 771 (6th Cir. 2009) (rejecting plaintiff's "efforts to elevate the [parties'] relationship to a *de facto* partnership" where such a conclusion would be in direct conflict with the agreed-upon terms in the parties' written agreement; rather, the plaintiff was an at-will employee in an "ordinary business relationship" and was not owed a fiduciary duty as a matter of law); *Miller v. Reminger Co., L.P.A.*, No. 3:11-cv-315-CRS, 2012, U.S. Dist. LEXIS 20802, at *5-6 (W.D. Ky. Feb. 17, 2012) (declining to look beyond the terms of the parties' agreement to find that the parties entered into a partnership). The plaintiffs may not transform their contractually-created relationship into a joint venture or partnership after the fact where such an understanding would be directly contrary to their agreements.

### 3. Limited Agency

The plaintiffs argue for the first time in their pretrial memorandum that Lincoln-Walmac was the agent of the Southern Hemisphere Co-Owners. [Record No. 273, p. 7] Thus, they contend that Lincoln-Walmac owed them fiduciary duties as their agent. [*Id.*] However, because the plaintiffs have waited until the filing of their pretrial memorandum to raise this argument, they have effectively waived this contention. Moreover, the plaintiffs provide no legal authority or analysis in support of this claim, other than the conclusory assertion contained in their pretrial memorandum. Simply put, it is not the responsibility of the Court to make legal arguments for the parties.

But even if the Court were to assume that a principal-agent relationship was created, the extent of any agency relationship would be constricted by the terms of the SHLA. *See 21C LLC v. Wyndham Mgmt. Corp.*, No 3:05CV-751-S, 2006 U.S. Dist. LEXIS 45298, at *10-14 (W.D.

Ky. June 29, 2006). "Where a contract exists defining the scope of the principal-agent relationship . . . the existence and extent of the agent's duties are determined by the agreement between the parties." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, 242 F. Supp. 2d 438, 449 (W.D. Ky. 2003); Restatement (Second) of Agency § 376; *Crestwood Farm*, 2014 U.S. App. LEXIS 8751, at *16-17. Thus, the plaintiffs' contention that Lincoln-Walmac owes them a general fiduciary duty concerning any of its actions in the Southern Hemisphere fails. Moreover, the plaintiffs' breach of fiduciary duty claim is premised upon the same activities that are the basis of their breach of contract and good faith and fair dealing claims (*i.e.*, setting the advertised stud fee too high, providing unreasonably discounted stud fees, and charging for unreasonable expenses in the form of inflated Saybrook advertising bills). The Court, however, already determined that these claims are without merit. The same conclusion applies here regarding the plaintiffs' breach of fiduciary duty claim.

## C.     Accounting (Count 9)

The parties' most recent filings provide conflicting accounts concerning whether this claim remains. [*Compare* Record No. 273 *with* Record No. 280.] The plaintiffs seem to argue that they are only pursuing this claim against Lincoln-Walmac under the Southern Hemisphere Agreements. However, the defendants believe this claim remains pending by the plaintiffs and Co-Plaintiff Sullivan against Lincoln-Walmac. [Record No. 280, p. 2]

The Court concludes that the plaintiffs's accounting claim remains pending against Lincoln-Walmac, and by Plaintiff Sullivan against Walmac Farm, Lincoln-Walmac, Walmac Stud, and Jones.

As this Court previously explained,

> An accounting is an equitable remedy and is defined as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Karem v. Bryant*, 370 S.W.3d 867, 871 (Ky. 2012) (citing 1 Am. Jur. 2d *Accounts and Accounting* § 52) (quotation marks omitted). The Kentucky Court of Appeals recently opined that "[t]he underlying theory [of a claim for an accounting] is unjust enrichment - an accounting primarily prevents unjust enrichment by mandating the return of any benefit received as a result of a breach of fiduciary duty. To maintain an accounting, the claimant must have a contractual or fiduciary relationship with the defendant against whom the accounting is directed and an interest in the monies or property subject to the accounting." *Gentry v. Cremeens*, No. 2008-CA-830-MR, 2009 Ky. App. Unpub. LEXIS 139, at *5 (Ky. Ct. App. May 29, 2009) (citation and quotations omitted); *see also Holley Performance Prods. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-53-TBR, 2009 U.S. Dist. LEXIS 102709, at *7 (W.D. Ky. Oct. 28, 2009) ("An accounting is a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation. It is a statement in writing of debts and credits or of receipts and payments.").

[Record No. 127, p. 27]

Additionally, as an equitable remedy, an accounting requires insufficiency of legal remedies. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). The plaintiffs "have the burden of proving the inadequacy of the legal remedies afforded to them by discovery." *City of Owensboro v. Ky. Utils. Co.*, No. 4:04CV-87-M, 2008 U.S. Dist. LEXIS 82174, at *5-6 (W.D. Ky. Oct. 15, 2008). Further, the plaintiffs "must be able to show that the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." *Dairy Queen, Inc., 369 U.S. at 478.*

The defendants contend that Sullivan does not have a valid basis to assert an accounting claim against Walmac Farm, Lincoln-Walmac, Walmac Stud, and Jones. [Record No. 213-1, pp. 15-17.] In response, Sullivan argues that he has the requisite relationship with Walmac Farm

and Jones *via* the Mare Agreement to support this claim, but he does not address his claim against Walmac Stud and Lincoln-Walmac. [Record No. 238, p. 33] By failing to contest these arguments, Sullivan has effectively conceded his claim. *See Lucas v. Chance*, 121 F. App'x. 77, 79 n.2 (6th Cir. 2005). Nonetheless, because Sullivan is only a party to the Mare Agreement and not a co-owner of Ready's Image, he does not have a contractual or fiduciary relationship with either Walmac Stud or Lincoln-Walmac and, therefore, no basis to seek an accounting with respect to these defendants.

Regarding the parties' remaining accounting claim, the plaintiffs and Sullivan are unable to demonstrate that the legal remedies afforded through discovery are insufficient. The defendants have provided over 871 megabytes of files consisting of roughly 20,000 pages of discovery relating to Ready's Image. This does not include documents produced by non-parties in response to subpoenas and documents produced by the plaintiffs. The defendants have also represented that they have produced all information and records relating to the income and expenses relevant to Ready's Image. [Richard Galasso's Affidavit , Record No. 226 ¶ 21; *see also* Record No. 213-1, p. 30.] Although the plaintiffs allege that the defendants have failed to produce all records related to Ready's Image, the only document the plaintiffs identify is the General Ledger for Walmac Stud and Walmac Farm, which purportedly reflects the day-to-day expenses incurred relating to Ready's Image. [Record No. 238, p. 33] Despite the plaintiffs' accounting claims against both of these parties not being before the Court,[13] the defendants state

---

13      Sullivan's accounting claim against Walmac Farm remains pending.

that no such document exists.[14]  [Record no. 226, p. 11]  Finally, the defendants' counsel has provided a sworn affidavit stating that:

> A "general ledger" report relative only to Ready's Image transactions was created on December 19, 2013 and e-mailed to Plaintiffs (WF773-863). This report was created from the Peachtree accounting software. It contains no new information and is duplicative of information already produced. All disbursements and receipts were accounted for in the spreadsheets, invoices, and statements. All of the information summarized in this reports is contained in Set R which was current through April, 2013 and then supplemented.

[*Id.*, pp. 12-13]  Based upon these sworn representations, the legal remedies available to the plaintiffs are sufficient.

Finally, the parties have consistently relied on the Court to resolve discovery disputes as this matter has progressed.  [*See, e.g.*, Record Nos. 114, 117, 121, 122, 125, 128, 129, 136, 143.] The United States Magistrate Judge expeditiously addressed and resolved any disputes as they arose.  Indeed, the prevalence of the parties' discovery disputes not only required counsel for the parties to be routinely reminded that they are charged with the responsibility of conferring (*i.e.*, actually talking with one another) in an effort to reach an agreed resolution, but also necessitated monthly status conferences before the Magistrate Judge to address disputes.  The plaintiffs also have issued several third-party subpoenas seeking information related to Ready's Image.

In short, the legal remedies available to the parties are adequate.  Further, the nature of the documents at issue do not present complicating circumstances that only the Court can satisfactorily unravel.  *Chisholm v. Am. Cold Storage, Inc.*, No. 3:09-CV-808-CRS, 2013 U.S.

---

14      The defendants have sufficiently explained that it is possible to create a "general ledger" report from the Peachtree Accounting software but to do so is neither practical nor would it be responsive to discovery requests because it would only produce additional, irrelevant information that the Court has already ruled to not be within the scope of discovery.

Dist. LEXIS 71457, at *28-29 (W.D. Ky. May 21, 2013) (noting that "where a party had the opportunity to establish their damage claim through discovery, a request for an accounting is not appropriate") (citations omitted); *see also City of Owensboro*, 2008 U.S. Dist. LEXIS 79292, at *5 (noting that courts and commentators have indicated that, "at least in the federal courts, one may now conclude that the remedy of an 'accounting' no longer exists in cases of complex accounts").

### D.    Rescission and Reformation (Count 14)

It does not appear that the issues which the plaintiffs allege as the basis of their claims of rescission and reformation remain pending before this Court. Instead, these issues are subject to arbitration pursuant to prior orders. The defendants, however, argue that the plaintiffs' rescission and reformation claims against Lincoln-Walmac remain pending. It is unclear what alleged conduct by Lincoln-Walmac forms the basis for the plaintiffs' claims for rescission or reformation. [Record No. 280, p. 2.] The plaintiffs, on the other hand, make no mention of reformation or rescission in listing the remaining claims. [Record No. 273] Thus, the Court concludes that the plaintiffs have either abandoned this claim against Lincoln-Walmac or it is an issue that is subject to arbitration.

### E.    Miscellaneous Arguments

#### 1.    Statute of Limitations

The defendants argue that they are entitled to summary judgment of all claims accruing prior to April 1, 2009, pursuant to the two-year statute of limitations applicable to the COA. [Record No. 213-1, pp. 32-33] They contend that this provision was incorporated into the

Southern Hemisphere Agreements. However, the defendants concede that the Southern Hemisphere and the Mare Agreements were entered after April 1, 2009. [Record No. 257, p. 2] The plaintiffs' only remaining claims pertain to these agreements. Therefore, any acts giving rise to claims related to the Mare Agreement and Southern Hemisphere Agreement could not have occurred prior to April 1, 2009. Thus, the COA's statute of limitations provision does not entitle the defendants to summary judgment on any of their remaining claims.

### 2. Damages

The defendants argue that the plaintiffs have failed to provide any evidence of damages except for the December 30, 2013 report of their proposed expert Roy Kvalo. [Record no. 213-1, pp. 34-35; Record No. 256, p. 15] They contend that Kvalo's testimony regarding damages must be excluded for the same reasons contained in their motion *in limine*. They reason that, because Kvalo's testimony must be excluded, there is no evidence of damages and summary judgment on the plaintiffs' claims is appropriate.

Since the defendants filed their motion for summary judgment, the Court granted the defendants' motion *in limine*, excluding Kvalo from providing opinion testimony concerning damages. [Record No. 284] Notwithstanding this fact, the Court is not convinced that this will foreclose the plaintiffs from providing evidence regarding damages. For instance, the Mare Plaintiffs argue that they have not received their portion of the $79,134.70 generated pursuant to the agreement. Concerning the SHLA, the plaintiffs contend that Lincoln-Walmac failed to collect approximately $130,000.00 owed.

## F.     Plaintiff Bryan Sullivan

The parties have struggled to provide a coherent summary of claims specific plaintiffs are asserting against specific defendants.  This is especially noteworthy regarding Sullivan.  Unsure of whether Sullivan was alleging claims under Counts 1, 2, 4, 5, 7, and 14, the defendants moved for summary judgment on these claims.  However, the plaintiffs indicate in their joint response that Sullivan is not asserting these claims.  Additionally, Sullivan concedes that he is unable to meet his burden regarding his claims for violation of the New Jersey Consumer Fraud Act (Count 12) and RICO (Count 13).  [Record No. 238, p. 3 n. 2]  Based on Sullivan's representations, the defendants will be granted summary judgment regarding Counts 12 and 13.  Further, Sullivan is no longer pursuing his fraud claim in this Court.[15]  [*See* Record Nos. 273, 280.]

Defendants Walmac Stud and Jones have also moved for summary judgment on Sullivan's claim for conversion (Count 11).  [Record No. 213-1, pp. 18-19]  Sullivan did not respond to the motion.  Regardless, as the Court explained previously, a conversion claim does not exist if the property right allegedly converted arises entirely from the contractual right to compensation.  [Record No. 127, pp. 30-33]  Here, Sullivan is not a co-owner of Ready's Image and is only a party to the Mare Agreement.  His only property right alleged to have been

---

15     Defendant Saybrook Advertising, LLC was granted summary judgment on Sullivan's fraud claim on April 17, 2014.  [Record No. 271]  This left Sullivan's fraud claim against Defendants Walmac Farm, Walmac Stud, and Jones.  The plaintiffs did not identify a fraud claim asserted by Sullivan during the final pretrial conference.  This is consistent with the plaintiffs' representation in their pretrial memorandum, as well as their proposed jury instructions.

converted is based on his contractual right to compensation under the Mare Agreement. Thus, and the claim fails as a matter of law.

## IV.

For the reasons discussed above, it is hereby

**ORDERED** as follows:

1.     Defendants Walmac Stud Management, LLC, Walmac Farm, LLC, John T.L. Jones, III, and Lincoln-Walmac Associated Farms, Pty Ltd.'s motion for summary judgment [Record No. 213] is **GRANTED**, in part, and **DENIED**, in part, as outlined above with respect to the following claims and parties:

a.     Count 2 for breach of the Southern Hemisphere Agreements by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS against Defendant Lincoln-Walmac is **GRANTED** regarding the plaintiffs' claim that the expenses charged to the Southern Hemisphere Co-Owners were not reasonable. The defendants' motion for summary judgment is **DENIED** regarding the plaintiffs' claim that Lincoln-Walmac failed to collect all stud fees due in the Southern Hemisphere; and

b.     Count 5 for breach of the covenant of good faith and fair dealing of the Southern Hemisphere Agreements, by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS against Defendant Lincoln-Walmac is **GRANTED** regarding the plaintiffs' claims that Lincoln-Walmac (i) unreasonably set the advertised stud fees in the Southern Hemisphere too high and, therefore, improperly inflated its own fee; (ii) offered and sold nominations to its parent company, Lincoln Farm, at an unreasonably discounted price and at

a price lower than those offered to the plaintiffs; and (iii) continued to sell nominations to Lincoln Farm after it had failed to pay for any nominations previously purchased. The defendants' motion for summary judgment is **DENIED** regarding the plaintiffs' claim that Lincoln-Walmac made no effort to recoup payment from Lincoln Farm for outstanding stud fee payments.

2.     Defendants Walmac Stud Management, LLC, Walmac Farm, LLC, John T.L. Jones, III, and Lincoln-Walmac Associated Farms, Pty Ltd.'s motion for summary judgment [Record No. 213] is **GRANTED**, with respect to the following claims and parties:

a.     Count 6 for breach of the covenants of good faith and fair dealing of the Mare Agreement, by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS and Co-Plaintiff Sullivan against Defendants Walmac Farm and Walmac Stud.

b.     Count 7 for breach of fiduciary duties, by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS against Defendant Lincoln-Walmac;

c.     Count 9 for accounting, by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS against Defendant Lincoln-Walmac, and by Co-Plaintiff Sullivan against Defendants Walmac Farm, Lincoln-Walmac, Walmac Stud, and Jones;

d.     Count 11 for conversion, by Co-Plaintiff Sullivan against Walmac Stud and Jones;

e.     Count 12 for violation of the New Jersey Consumer Fraud Act, by Co-Plaintiff Sullivan, in its entirety; and

f.     Count 13 for violation of RICO, by Co-Plaintiff Sullivan, in its entirety.

3.      Defendants Walmac Stud Management, LLC, Walmac Farm, LLC, John T.L. Jones, III, and Lincoln-Walmac Associated Farms, Pty Ltd.'s motion for summary judgment [Record No. 213] is **DENIED**, with respect to the following claims and parties:

a.      Defendant Lincoln-Walmac's counterclaims; and

b.      Count 3 for breach of the Mare Agreement by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS and Plaintiff Sullivan against Defendants Walmac Farm and Walmac Stud.

4.      Defendants Walmac Stud Management, LLC, Walmac Farm, LLC, John T.L. Jones, III, and Lincoln-Walmac Associated Farms, Pty Ltd.'s motion for summary judgment [Record No. 213] is **DENIED**, as moot, with respect to the following claims and parties:

a.      Count 14 for rescission/reformation, by  by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS and Co-Plaintiff Sullivan against Lincoln-Walmac;

b.      Counts 9 and 10, by Plaintiffs Scatuorchio, LLC, Kevin Scatuorchio, Courtney Sullivan, and JTS against Defendant Walmac Farm; and

c.      Counts 1, 2, 4, 5, 7, 10, and 14,  by Plaintiff Sullivan, in their entirety.

This 20th day of May, 2014.



Signed By:
*Danny C. Reeves*
United States District Judge

-41-